**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

COALITION OF AMERICAN
MANUFACTURERS OF MOBILE ACCESS
EQUIPMENT,

          Plaintiff,

ZHEJIANG DINGLI MACHINERY CO., LTD.,

          Consolidated Plaintiff,

          v.

UNITED STATES,

          Defendant,

          and

ZHEJIANG DINGLI MACHINERY CO., LTD.,

          Defendant-Intervenor,

COALITION OF AMERICAN
MANUFACTURERS OF MOBILE ACCESS
EQUIPMENT

          Defendant-Intervenor.

Before: Hon. Claire R. Kelly,
        Judge

Consol. Court No. 26-00702

**ORDER**

Upon consideration of the motion of the Coalition of American Manufacturers of Mobile Access Equipment for judgment on the agency record, and all other papers and proceedings herein, it is hereby

**ORDERED,** that the Coalition of American Manufacturers of Mobile Access Equipment's motion for judgment on the agency record is granted; and it is further

**ORDERED,** that this action is remanded to the U.S. Department of Commerce for proceedings consistent with this Court's opinion.

**Ct. No. 26-00702**

**SO ORDERED**.

_____
Hon. Claire R. Kelly, Judge

Dated: _____, 2026
          New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,<br><br>Plaintiff,<br><br>ZHEJIANG DINGLI MACHINERY CO., LTD.,<br><br>Consolidated Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>ZHEJIANG DINGLI MACHINERY CO., LTD.,<br><br>Defendant-Intervenor,<br><br>COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT<br><br>Defendant-Intervenor. | Before: Hon. Claire R. Kelly, Judge<br><br>Consol. Court No. 26-00702 |

**PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT
ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, the Coalition of American Manufacturers of Mobile Access Equipment ("Plaintiff") hereby moves for judgment on the agency record with respect to the determination of the U.S. Department of Commerce ("Commerce") in the 2022 administrative review of the countervailing duty order on *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China. See Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 90 Fed. Reg. 59,492 (Dep't Commerce Dec. 19, 2025) (final results of countervailing duty admin. rev.) and accompanying Issues and Decision Memorandum.

**Ct. No. 26-00702**

For the reasons explained in the accompanying memorandum, Plaintiff respectfully moves that this Court find certain agency findings, conclusions, and/or determinations with respect to this decision are not supported by substantial evidence or otherwise not in accordance with law. Plaintiff further moves that the Court remand this determination to Commerce for disposition consistent with the Court's final opinion.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.
Theodore P. Brackemyre, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition of American*
*Manufacturers of Mobile Access Equipment*

Dated: June 26, 2026

2

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

COALITION OF AMERICAN
MANUFACTURERS OF MOBILE ACCESS
EQUIPMENT,

    Plaintiff,

ZHEJIANG DINGLI MACHINERY CO., LTD.,

    Consolidated Plaintiff,

  v.

UNITED STATES,

    Defendant,

  and

ZHEJIANG DINGLI MACHINERY CO., LTD.,

    Defendant-Intervenor,

COALITION OF AMERICAN
MANUFACTURERS OF MOBILE ACCESS
EQUIPMENT

    Defendant-Intervenor.

Before: Hon. Claire R. Kelly,
   Judge

Consol. Court No. 26-00702

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S RULE 56.2 MOTION FOR
JUDGMENT ON THE AGENCY RECORD**</u>

       Timothy C. Brightbill, Esq.
       Laura El-Sabaawi, Esq.
       Enbar Toledano, Esq.
       Theodore P. Brackemyre, Esq.

       WILEY REIN LLP
       2050 M Street, NW
       Washington, DC 20036
       (202) 719-7000

       *Counsel to the Coalition of American
       Manufacturers of Mobile Access Equipment*

**Dated:  June 26, 2026**

Ct. No. 26-00702                                                    **PUBLIC DOCUMENT**

## TABLE OF CONTENTS

**Page**

I.    Introduction ........................................................................................................................1

II.   Statement Pursuant to Rule 56.2 .......................................................................................1

    A.    Administrative Determination Under Review ........................................................1

    B.    Issues Presented for Review .................................................................................1

III.  Statement of the Facts .......................................................................................................4

IV.   Legal Standards .................................................................................................................7

    A.    Standard of Review ..............................................................................................7

    B.    LTAR vs. MTAR Regulations ..............................................................................9

        1.    Core Distinctions .....................................................................................9

        2.    Benchmark Hierarchy ............................................................................10

        3.    Included in Price ....................................................................................10

        4.    Excluded from Price ...............................................................................11

V.    Argument ........................................................................................................................11

    A.    Commerce Erroneously Relied on Global, Rather Than Chinese,
        MTAR Benchmark Prices ....................................................................................11

    B.    Commerce Erroneously Replaced Per-Unit MTAR Benchmark
        Prices with Per-Kilogram Prices .........................................................................16

    C.    Commerce Erroneously Relied on Dingli's Inland Freight Costs
        Rather Than Continuing to Benchmark Inland Freight .......................................20

V.    Conclusion ......................................................................................................................23

Ct. No. 26-00702    **PUBLIC DOCUMENT**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altx, Inc. v. United States*,
　　25 CIT 1100, 167 F. Supp. 2d 1353 (2001) ...................................................................8

*Ashley Furniture Indus., LLC v. United States*,
　　607 F. Supp. 3d 1210 (Ct. Int'l Trade 2022) ...........................................................15

*Bando Chem. Indus., Ltd. v. United States*,
　　16 CIT 133, 787 F. Supp. 224 (1992) ...........................................................................8

*Beijing Tianhai Indus. Co. v. United States*,
　　52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015) ..................................................3, 21, 22

*Burlington Truck Lines, Inc. v. United States*,
　　371 U.S. 156 (1962)........................................................................................................8

*China First Pencil Co. v. United States*,
　　34 CIT 1284, 721 F. Supp. 2d 1369 (2010) ...............................................................8

*Consol. Edison Corp. v. NLRB*,
　　305 U.S. 197 (1938).........................................................................................................7

*Essar Steel Ltd. v. United States*,
　　678 F.3d 1268 (Fed. Cir. 2012).................................................................................3, 22

*Matsushita Elec. Indus. Co. v. United States*,
　　750 F.2d 927 (Fed. Cir. 1984)........................................................................................8

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*,
　　463 U.S. 29 (1983)...........................................................................................................8

*New Am. Keg v. United States*,
　　No. 20-00008, 2021 WL 1206153 (Ct. Int'l Trade Mar. 23, 2021)........................8

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
　　44 F.3d 978 (Fed. Cir. 1994)..........................................................................................7

*Universal Camera Corp. v. NLRB*,
　　340 U.S. 474 (1951)..........................................................................................................7

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ..................................................................................................24

Ct. No. 26-00702                                                    **PUBLIC DOCUMENT**

19 U.S.C. § 1677(5)(E) ...........................................................................2, 10, 13, 15, 16

Tariff Act of 1930 ...........................................................................................................24

**Regulations**

19 C.F.R. § 351.511 .........................................................................3, 9. 10, 11, 12, 20

19 C.F.R. § 351.512 .........................................................................2, 9, 11, 14, 16, 18

**Administrative Materials**

*Certain Chassis and Subassemblies Thereof from the Kingdom of Thailand,*
    90 Fed. Reg. 36,132 (Dep't Commerce Aug. 01, 2025) ..........................................17

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's
    Republic of China,*
    90 Fed. Reg. 59,492 (Dep't Commerce Dec. 19, 2025) ......................................1, 6, 7

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's
    Republic of China,*
    90 Fed. Reg. 15,443 (Dep't Commerce Apr. 11, 2025) .............................................4

*Certain Softwood Lumber Products from Canada,*
    90 Fed. Reg. 38,755 (Dep't Commerce Aug. 12, 2025) ......................................16, 17

*Certain Stainless Steel Butt-weld Pipe Fittings From Taiwan; Final Results of
    Antidumping Duty Administrative Review,*
    71 Fed. Reg. 67,098 (Nov. 20, 2006) ............................................................17, 18, 19

*Certain Forged Stainless Steel Flanges From India (flanges) From India,*
    66 Fed. Reg. 48,244 (Sep. 19, 2001) ................................................................17, 19

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    89 Fed. Reg. 8,641 (Dep't Commerce Feb. 8, 2024) .................................................4

*Mobile Access Equipment and Subassemblies Thereof From the People's
    Republic of China,*
    91 Fed. Reg. 3,121 (Dep't Commerce Jan. 26, 2026) ...............................................7

*Multilayered Wood Flooring From the People's Republic of China,*
    86 Fed. Reg. 59,362 (Dep't Commerce Oct. 27, 2021) ...........................................21

*Regulations Enhancing the Administration of the Antidumping and
    Countervailing Duty Trade Remedy Laws,*
    89 Fed. Reg. 101,694 (Dec. 16, 2024) .....................................................................9

**PUBLIC DOCUMENT**

## I.    INTRODUCTION

On behalf of the Coalition of American Manufacturers of Mobile Access Equipment ("Plaintiff" or "Petitioner"), we respectfully submit the following brief in support of Plaintiff's motion for judgment on the agency record.

## II.    STATEMENT PURSUANT TO RULE 56.2

### A.    <u>Administrative Determination Under Review</u>

The administrative determination under review is the U.S. Department of Commerce's ("Commerce") final determination in the administrative review covering the period April 13, 2022, through March 31, 2023, of the countervailing duty order on *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*.  The final results were issued on December 15, 2025, and published in the *Federal Register* on December 19, 2025.  *See Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 90 Fed. Reg. 59,492 (Dep't Commerce Dec. 19, 2025) (final results of countervailing duty admin. rev.; 2022), P.R. 318 ("Final Results") and accompanying Issues and Decision Memorandum, P.R. 315 ("IDM").

### B.    <u>Issues Presented for Review</u>

1.    In constructing its benchmark for the mobile access equipment for more than adequate remuneration ("MTAR") program, was Commerce's determination to rely on global prices, in lieu of Chinese market prices, supported by substantial evidence and in accordance with law?

No.  An MTAR analysis asks whether a government buyer paid more for a respondent's products than the price the respondent would have received in ordinary home market sales.  Home market distortions are immaterial to that analysis, which simply asks what price the respondent

would have received but for the government purchase—whatever the "prevailing market conditions" may be. *See* 19 U.S.C. § 1677(5)(E). Citing distortions in the Chinese market, Commerce disregarded Chinese data on the record and calculated its MTAR benchmark from global mobile access equipment prices. That determination was incorrect, contrary to record evidence, and inadequately explained. In an MTAR analysis, home market distortions are not adequate reason to disregard home market data, particularly without any corresponding explanation tying the distortions found to the MTAR program. Further, because Chinese law penalizes the purchase of non-Chinese mobile access equipment, global prices are neither legally relevant nor attainable in fact to the Chinese government. As such, to conduct a lawful and accurate analysis, Commerce should have used either the Chinese price quotes that Plaintiff placed on the record or China-only prices from the global data set to calculate its MTAR benchmark in this review.

2.       In constructing its benchmark for the mobile access equipment for MTAR program, was Commerce's determination to calculate its benchmark on a weight (*i.e.*, per-kilogram) basis instead of a per-unit basis supported by substantial evidence and in accordance with law?

No. Commerce's replacement of actual prices per mobile access equipment unit with a hypothetical per-kilogram price was arbitrary and not in accordance with law. Commerce's MTAR regulations direct Commerce to construct a benchmark from "actual transactions," 19 C.F.R. § 351.512(a)(2)(i), which counsels in favor of constructing a benchmark grounded in commercial reality. As such, Commerce generally calculates benchmarks in the prevailing unit in which market sales actually take place. Here, Commerce departed from that general practice to account for large variations in mobile access equipment products and prices. But Commerce's adjustment to the MTAR benchmark introduced its own distortions, *e.g.*, by giving heavy but

**PUBLIC DOCUMENT**

technologically simple products outsized influence over the benchmark average. Because Commerce's "fix" for a broad product set purported to solve for one distortion while introducing others that were more significant, artificially converting unit prices into per-kilogram prices was an arbitrary and ineffective departure from agency practice.

3.     In benchmarking inputs for the less-than-adequate-remuneration ("LTAR") programs at issue, was Commerce's determination to rely on Zhejiang Dingli Machinery Co., Ltd.'s ("Dingli") actual inland freight prices, rather than constructing a benchmark, supported by substantial evidence and in accordance with law?

No. Commerce's LTAR regulations direct Commerce to measure "the price that <u>a firm</u> actually paid or would pay if it imported the product." 19 C.F.R. § 351.511(a)(2)(iv).[1] Both Commerce and this Court have long recognized that "'a firm' does not mean the respondent. Rather, it refers to a hypothetical firm located in the PRC purchasing" the input in question. *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1374 (Ct. Int'l Trade 2015). Accordingly, Commerce has a "practice of ordinarily declining to rely upon delivery charge data that is specific to a particular respondent when using a tier-two benchmark{.}" *Id*. at 1375. And "the Federal Circuit has upheld the Department's practice of ignoring a particular respondent's conditions of purchase when calculating tier-two benchmark prices" for an LTAR program. *Id.* at 1374 (citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1274 (Fed. Cir. 2012)). Commerce's unexplained departure from that practice here—particularly while benchmarking other comparable inputs, like ocean freight—was arbitrary and thus not in accordance with law.

---

[1]     Unless otherwise noted, all emphasis in this brief has been added, and all internal citations, quotations, and alterations have been omitted.

### III.    STATEMENT OF THE FACTS

On February 8, 2024, Commerce published its notice of initiation of an administrative review of the countervailing duty order on *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China* for the period of review from January 1, 2022, to December 31, 2022. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 8,641 (Dep't Commerce Feb. 8, 2024), P.R. 8.

Commerce examined Dingli as the lone mandatory respondent and, ultimately, the only Chinese producer or exporter subject to the administrative review. *See Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 90 Fed. Reg. 15,443 (Dep't Commerce Apr. 11, 2025) (prelim. results and partial rescission of antidumping duty admin. rev.; 2022), P.R. 278 ("Prelim. Results") and accompanying Preliminary Decision Memorandum at 2–3, P.R. 273 ("Prelim. Decision Memo"). Dingli filed its initial questionnaire responses between April 2024 and June 2024, and supplemental questionnaire responses between August 2024 and December 2024. Prelim. Decision Memo at 2.

On July 12, 2024, Plaintiff submitted new subsidy allegations regarding five programs: four related to Dingli's purchase of certain mobile access equipment inputs for LTAR and one related to Dingli's sale of mobile access equipment for MTAR to the Government of China. *Id.* at 2. Commerce received no rebuttal comments and, on December 20, 2024, initiated investigations into all five programs. *See id.* at 2–3.

Commerce issued its preliminary results on April 7, 2025, which were published on April 11, 2025. Prelim. Results, 90 Fed. Reg. at 15,443. Commerce preliminarily calculated a countervailing duty rate of 79.33% for Dingli. *Id.* at 15,444. In its preliminary calculations for the MTAR program, Commerce relied on Global Trade Atlas ("GTA") data for the Harmonized

4

Schedule ("HS") subheadings provided in the scope of the underlying order, (8427.10, 8427.20, 8427.90), and compared the resulting per-unit benchmark prices to Dingli's reported purchase per-unit price for individual transactions.  Prelim. Decision Memo at 25, 38.  For the various LTAR programs, Commerce relied on data provided by Plaintiff from "World Bank's Doing Business 2020 – Economy Profile of China" to value Dingli's inland freight expenses.  *Id.* at 25.

Following the issuance of the preliminary results, the parties filed case and rebuttal briefs in May 2025.  Final I&D Memo at 2.  Plaintiff's case brief identified certain issues for Commerce to address in reaching its final results.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Case Brief* (May 9, 2025), C.R. 184, P.R. 300 ("Pl. Case Br.").  As relevant to this appeal, Plaintiff argued that Commerce should not rely on global GTA data to construct its MTAR benchmark, but rather global market price quotes reflecting prices actually available in China, which Plaintiff had submitted.  *See id.* at 3–10.  Alternatively, and at minimum, Commerce should rely on Chinese shipment data only from the global prices from GTA.  *Id.* at 4.  Plaintiff explained that excluding Chinese pricing data from Commerce's MTAR benchmark, and relying instead on global prices that Chinese law effectively prohibits, would necessarily understate the amount of the subsidy Dingli received.  *See id.*

Dingli also filed a case brief, in which it argued that the MTAR benchmark price should not be calculated per unit but rather by weight (*i.e.*, on a per-kilogram basis).[2]  Letter from Grunfeld

---

[2]    In support of the proposed recalculation, Dingli also asked Commerce to recalculate the MTAR benchmark using UN Comtrade rather than GTA data, placing UN Comtrade data on the record for the first time.  *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Request to Reject Portions of Dingli's April 17, 2025 Rebuttal Factual Information Submission* (Apr. 28, 2025), C.R. 179, P.R. 288.  Plaintiff showed that Dingli's submission constituted untimely new factual

Desiderio Lebowitz Silverman Klestadt, to Sec'y Commerce, re: *Dingli's Administrative Case Brief in the Second Administrative Review of the Countervailing Duty Order on Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China* (C-570-140) (May 9, 2025) Dingli Case Br. at 19–20, C.R. 181-3, P.R. 296-7 ("Dingli Case Br."). Dingli further argued that Commerce should not benchmark inland freight costs for LTAR purposes but rather use Dingli's actual costs for inland freight. *Id.* at 21–27. In opposition, Plaintiff explained that per-unit pricing—or, more specifically, pricing in whatever a market's standard unit of sale—is agency policy, and that Dingli's proffered per-kilogram approach would depart from that policy without improving accuracy or decreasing alleged distortions. Letter from Wiley Rein LLP, to Sec'y Commerce, re: *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Rebuttal Brief* (May 21, 2025) at 13–17, C.R. 186, P.R. 306 ("Pl Rebuttal Br"). Plaintiff also argued that Commerce should continue to benchmark inland freight costs, consistent with agency practice and other recent proceedings.

Commerce issued its final results on December 16, 2025, which were published on December 19, 2025. Final Results, 90 Fed. Reg. at 59,492. The agency made various changes to its final calculations and responded to a number of the arguments raised by Plaintiff and Dingli in their case and rebuttal briefs. *See* IDM at 4–37. With regard to the MTAR program, Commerce declined to rely either on the price quotes submitted by Plaintiff or Chinese-only GTA data, and changed its benchmark analysis to be on a per-kilogram basis as requested by Dingli. *See id.* at

---

information, which should have been stricken. *See id.* And Plaintiff explained that, as a consequence of its belated submission, Plaintiff did not have an opportunity to address the UN Comtrade data in its benchmark submissions. *See* Pl. Rebuttal Br. at 14–15. For purposes of this appeal, the global database from which Commerce ultimately calculated its MTAR benchmark (GTA or UN Comtrade) is immaterial.

22–25.  With regard to the LTAR programs, Commerce chose to rely on Dingli's actual inland freight costs, rather than benchmarking inland freight as it preliminarily had done and continued to do for other inputs.  *See id.* at 35–36.  As a result of these and other findings, Commerce calculated a final countervailing duty rate of 32.26% for Dingli.  Final Results, 90 Fed. Reg. at 59,493.  To correct a ministerial error, Commerce published amended final results in the Federal Register on January 26, 2026, establishing an amended final countervailing duty rate of 33.10%.  *Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 91 Fed. Reg. 3,121 (Dep't Commerce Jan. 26, 2026) (amended final results of countervailing duty admin. rev.; 2022), P.R. 325.

Because certain of Commerce's determinations were unsupported by substantial evidence and not in accordance with law, this appeal followed.

## IV.    LEGAL STANDARDS

### A.    Standard of Review

This Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).

Substantial evidence "is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is measured by the entire record, and Commerce "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn."  *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994).  "{I}t is not enough for

7

Commerce simply to 'determine' . . . that the record does not support a particular conclusion without addressing the evidence both in support of and in derogation of that conclusion, and it is likewise not enough for Commerce to 'continue to find' something that is unsupported by a discussion of the evidence in the first instance." *New Am. Keg v. United States*, No. 20-00008, 2021 WL 1206153, at \*18 (Ct. Int'l Trade Mar. 23, 2021). Thus, although Commerce need not address every single piece of evidence, "it must address significant arguments and evidence which seriously undermines its reasoning and conclusions." *Altx, Inc. v. United States*, 25 CIT 1100, 1117, 167 F. Supp. 2d 1353, 1374 (2001).

The Court must also determine whether the evidence and reasonable inferences from the record support the agency's findings. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Commerce "may not act arbitrarily in reaching its decision." *China First Pencil Co. v. United States*, 34 CIT 1284, 1289, 721 F. Supp. 2d 1369, 1375 (2010). Rather, its determinations "must have a reviewable, reasoned basis" to be affirmed. *Bando Chem. Indus., Ltd. v. United States*, 16 CIT 133, 136, 787 F. Supp. 224, 227 (1992), *aff'd*, 26 F.3d 139 (Fed. Cir. 1994). To satisfy that burden, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

### B.    LTAR vs. MTAR Regulations

In the underlying administrative review, Commerce investigated four LTAR programs and one MTAR program. While Commerce's LTAR framework is well-established under 19 C.F.R. § 351.511, its MTAR regulations and accompanying framework are both new and evolving. *See Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws*, 89 Fed. Reg. 101,694-01, 101,734 (Dec. 16, 2024) ("While Commerce offers parties a general standard in this final rule, it anticipates that its MTAR practice will continue to evolve with additional cases."). A December 2024 final rulemaking promulgated CVD regulations addressing government purchases of goods for MTAR for the first time, creating and rendering 19 C.F.R. § 351.512 effective as of January 15, 2025. *Id.* at 101,694. In light of the novelty of certain issues in this appeal related to the MTAR investigation, Plaintiff provides a brief overview and comparison of the LTAR and MTAR frameworks for reference.

### 1.    Core Distinctions

LTAR programs, governed by 19 C.F.R. § 351.511, cover the government as a <u>seller</u>, providing goods or services to a respondent for below-market prices. In an LTAR program, the subsidy benefit is the discount the respondent received as a purchaser (*e.g.*, for services, energy, land, or inputs) from a "market-determined price for the good or service resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2).

MTAR programs, governed by 19 C.F.R. § 351.512, cover the government as a <u>buyer</u>, purchasing goods from a respondent at above-market prices. In an MTAR program, the benefit received is the overpayment from the government to the respondent seller over a "market-determined price for the good based on actual transactions, including imports, between private parties in the country in question," to the extent they are available. 19 C.F.R. § 351.512(a)(2).

9

Both programs are described in the same statutory benefit provision at section 771(5)(E)(iv) of the Tariff Act of 1930, *i.e.*, 19 U.S.C. § 1677(5)(E)(iv).

### 2.    **Benchmark Hierarchy**

For an LTAR program, Commerce calculates the subsidy benefit (*i.e.*, the respondent discount) using a three-tier hierarchy. *See* 19 C.F.R. § 351.511(a)(2). <u>Tier One</u>: Commerce will compare government transaction prices with an in-country market-determined price from actual transactions. *Id.* <u>Tier Two</u>: If in-country prices are not reasonably available or the market is distorted, Commerce will compare a world market price reasonably available to purchasers in the country to the government prices. *Id.* <u>Tier Three:</u> If world market prices are not available, Commerce will evaluate whether the government price is consistent with market principles. *Id.*

For an MTAR program, Commerce also calculates the subsidy benefit (*i.e.*, the respondent surplus) using a three-tier hierarchy. *See id*. <u>Tier One</u>: Commerce will compare the government's purchase price to a market-determined price based on actual in-country transactions, including imports, between private parties. *Id.* <u>Tier Two</u>: If such prices are unavailable, Commerce will compare the government's purchase price to a world market price for the good. *Id.* <u>Tier Three</u>: If no market-determined domestic or world market prices are available, Commerce may analyze any premium provided to domestic suppliers in bid requests or procurement regulations, or use any other market-principles methodology.

### 3.    **Included in Price**

The LTAR and MTAR frameworks are methodological inversions with regard to what Commerce includes in the comparison (*i.e.*, non-government) price. LTAR uses delivered prices, which Commerce adjusts to reflect what a firm actually paid or would pay to import the product, including delivery charges and import duties. *See* 19 C.F.R. § 351.511(a)(iv). That is because

adequate remuneration for an LTAR program is what a respondent typically and realistically would have paid as a buyer, which includes the costs of delivery.

MTAR uses the opposite, in that Commerce uses ex-factory or ex-works prices, stripping out all delivery charges, import duties, and taxes from both the comparison price and the government's price. *See* 19 C.F.R. § 351.512(a)(iv). That is because adequate remuneration for an MTAR program is what the respondent typically would have netted as a seller.

### 4.     Excluded from Price

In an LTAR analysis, Commerce may exclude benchmark prices derived from countries with weak, ineffective, or nonexistent property (including intellectual property), human rights, labor, or environmental protections, where those deficiencies would likely impact such prices. *See* 19 C.F.R. § 351.511(a)(2)(v).

Under the MTAR rule, Commerce may exclude benchmark prices derived from countries whose prices are likely impacted by home market laws or policies such as price or production mandates. *See* 19 C.F.R. § 351.512(a)(2)(iii).

## V.     ARGUMENT

### A.     Commerce Erroneously Relied on Global, Rather Than Chinese, MTAR Benchmark Prices

In its preliminary analysis of the mobile access equipment for MTAR program, Commerce found "that prices from actual transactions involving buyers and sellers in China are significantly distorted such that they cannot be used as a tier one benchmark." Prelim. Decision Memo at 25. As such, Commerce preliminarily determined to use "an external tier two benchmark" to calculate Dingli's MTAR benefit. *Id.* In support—either inadvertently or erroneously—Commerce cited the LTAR regulation and described the benchmark as one "for the government provision of inputs for LTAR." *See id.* ("{W}e preliminarily find that the use of an external, tier two benchmark, as

11

described under 19 CFR 351.511(a)(2)(ii), is warranted to calculate the benefit for the government provision of inputs for LTAR.").

For purposes of constructing the benchmark, the only benchmark data on record were global market price quotes submitted by Plaintiff, reflecting prices available in China.  *See id*. Commerce declined to use those market prices as benchmarks, however, because they "are import quotes into the Chinese market, which we have found to be distorted, {so} they cannot be used." *Id.*  Commerce did not explain how the distortion was disqualifying for MTAR, as opposed to LTAR, purposes.  But finding "no suitable benchmarks on the record," Commerce benchmarked Dingli's sales of mobile access equipment for MTAR using global export data from GTA.  *Id*. Commerce had placed the GTA data on the record itself, and allowed the parties an opportunity to submit rebuttal factual information.  Memorandum from Paul Senoyuit, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. II to All Interested Parties, re: *Countervailing Duty Administrative Review of Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Deadline for Rebuttal Information for Benchmark Data Submitted by the U.S. Department of Commerce* (Apr. 10, 2025), P.R. 277.

In its case brief, Plaintiff explained why Commerce's reliance on worldwide GTA export prices was erroneous and should be revised.  *First*, Commerce did not explain its determination that the Chinese mobile access equipment market is too distorted for benchmarking use in an MTAR calculation.  *See* Pl. Case Br. at 7.  That is, even if the market for mobile access equipment is distorted, the fact of market distortions is not disqualifying for an MTAR analysis as it is for an LTAR program.  *See id*. at 7–8.  The benefit conferred by an MTAR program is the delta between the government price and what the home market would have paid—whatever the "prevailing market conditions":

> A benefit shall normally be treated as conferred where there is a benefit to the recipient, including—
>
> (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.
>
> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to <u>prevailing market conditions</u> for the good or service being provided or the goods being purchased <u>in the country which is subject to the investigation or review</u>. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

19 U.S.C. § 1677(5)(E).

Confusion on this point may arise because in the more-familiar LTAR analysis, market distortions are often assumed and prevent the use of home market prices as LTAR benchmarks. For example, in a widget for LTAR program in a China CVD review, the crux of the LTAR allegation is that the widget market in China is distorted as a whole. As such, the respondent's purchases of widgets cannot be benchmarked against Chinese prices (whether as tier 1 or 3), requiring resort to non-China prices under tier 2 or tier 3. That is not the case in the MTAR context. An MTAR allegation does not assume or require wholesale market distortions, only that the government has elected to buy widgets for more than market price. As such, an MTAR program neither presupposes market-wide distortion, nor compels resort to a global price for benchmarking purposes if distortions exist. Thus, Chinese prices (whether as tier 1 or 3) can be necessarily superior in an MTAR analysis, even where they would be inferior in the inverse LTAR context.

*Second*, the use of a global price as an MTAR benchmark was especially, and independently, problematic here in light of Chinese procurement rules. *See* Pl. Case Br. at 8–9. Commerce's MTAR regulation provides that, "{i}n measuring the adequacy of remuneration under this section, the Secretary may exclude certain prices from a particular country from its analysis if the Secretary determines that interested parties have demonstrated, with sufficient

13

information, that certain actions, including government laws or policies, such as price or production mandates or controls, likely impact such prices." 19 C.F.R. § 351.512(a)(2)(iii). That provision speaks directly to the situation here. The Government of China has enacted laws that compel its own purchasers to favor domestic mobile access equipment. *See* Pl. Case Br. at 8–9. Specifically, Chinese government procurement law affirmatively requires Chinese government purchasers and state-owned entities to prioritize the procurement of domestic Chinese goods over imports, absent a narrow showing that domestic equivalents are unavailable or commercially unsuitable. *See id.* Thus, applying 19 C.F.R. § 351.512(a)(2)(iii) to the record here, Commerce should have excluded from the benchmark analysis all foreign prices, because the volume and pricing of mobile access equipment imported into China is suppressed by the government's procurement preference for domestic goods. *See id.* Plaintiff thus demonstrated that Commerce should either have used Plaintiff's benchmark data reflecting prices actually available in China or the global GTA data narrowed to only Chinese prices for its MTAR benchmark. *See id.* at 9.

Commerce declined. In the Final Results, Commerce continued to reject Plaintiff's benchmark data, citing "a strong preference not to rely on price quotes for factor valuation purposes" and uncertainty as to "who the purchaser was" in the record quotes. IDM at 25. "Furthermore," Commerce stated, "market distortions remain applicable because these are Chinese market price quotes." *Id.* Commerce also rejected Plaintiff's alternative suggestion to narrow the GTA data to Chinese prices, similarly concluding without explanation that because it had found the Chinese market distorted, "both GTA data and price quotes from within China would be inappropriate to use." *See id.* Ultimately, Commerce calculated an MTAR benchmark price using global UN Comtrade data submitted by Dingli. *See id.*

14

For the same reasons explained in Plaintiff's case brief, the explanations Commerce provided in the Final Results are not enough. *First*, market distortions do not necessarily disqualify home market prices for MTAR purposes. Rather, the benefit conferred by an MTAR program is the difference between the government sale price and a market price, whatever the "prevailing market conditions" for such a price may be. *See* 19 U.S.C. § 1677(5)(E). Accordingly, Commerce needed to—but did not—explain its decision to exclude Chinese market prices from its MTAR calculations. *Second*, Commerce acknowledged (in its recitation of Plaintiff's arguments) but did not at all grapple with the effect of Chinese procurement law, which is to render world prices practically unavailable to Chinese government authorities. *See* IDM at 25.

Without explaining how a market distortion affects the MTAR (as opposed to an LTAR) program under investigation, Commerce's determination lacked substantial evidentiary support and was inadequately explained. *See State Farm*, 463 U.S. at 43 (explaining that an administrative agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"); *cf. Ashley Furniture Indus., LLC v. United States*, 607 F. Supp. 3d 1210, 1231 (Ct. Int'l Trade 2022) (finding Commerce's explanation "inadequate" where Commerce "did not substantiate its finding" or "address how this finding is relevant to Commerce's evaluation"). The Final Results' further failure to address the unavailability of global prices in China due to Chinese procurement rules, which were undisputed, is a failure "to consider an important aspect of the problem," rendering Commerce's benchmark determination arbitrary and capricious as well. *See State Farm*, 463 U.S. at 43. Because Commerce's benchmark determination ignored the commercial reality of Chinese market prices without adequate explanation, it should be remanded.

15

**PUBLIC DOCUMENT**

**B.**    **Commerce Erroneously Replaced Per-Unit MTAR Benchmark Prices with Per-Kilogram Prices**

Commerce's MTAR benchmark determination was also erroneous because Commerce replaced actual per-unit benchmark prices with hypothetical per-kilogram price equivalents. As provided above, Commerce preliminarily benchmarked Dingli's mobile access equipment for MTAR sales using global export data from GTA on a per-unit basis. Prelim. Decision Memo at 25. In its case brief, Dingli argued that Commerce should revise its benchmarking methodology. Specifically, Dingli argued that a per-unit benchmark was distortive because mobile access equipment "have wildly different per unit prices depending on the model." Dingli Case Br. at 13. Accordingly, Dingli asked Commerce to use a per-kilogram benchmark to mitigate distortions and yield "the most accurate results." *Id*. at 2.

Plaintiff disagreed for several reasons. *First*, consistent with the statute and Commerce's MTAR regulation, Commerce generally uses benchmarks that match commercial reality when they are available and reliable. *See* Pl. Rebuttal Br. at 13; 19 U.S.C. § 1677(5)(E)(iv) ("the adequacy of remuneration shall be determined in relation to prevailing market conditions," which "include price, quality, availability, marketability, transportation, and other conditions of purchase or sale"); 19 C.F.R. § 351.512(a)(2)(i) ("The Secretary will normally seek to measure the adequacy of remuneration by comparing the price paid to the firm for the good by the government to a market-determined price for the good based on actual transactions{.}"). Where merchandise is sold per meters cubed, Commerce uses per-meters-cubed benchmarks. *See* Issues and Decision Memorandum accompanying *Certain Softwood Lumber Products from Canada*, 90 Fed. Reg. 38,755 (Dep't Commerce Aug. 12, 2025) (final results and rescission, in part, of the countervailing duty administrative. rev.; 2023) at cmt. 5. Where merchandise is sold per kWh, Commerce uses per-kWh benchmarks. *See* Preliminary Decision Memorandum accompanying *Certain Chassis*

16

*and Subassemblies Thereof from the Kingdom of Thailand*, 90 Fed. Reg. 36,132 (Dep't Commerce

Aug. 01, 2025) (prelim. affirmative countervailing duty deter. and alignment of final deter. with

final antidumping duty deter.) at 33.

In the narrow cases cited by Dingli, in which Commerce calculated benchmarks on a per-

kilogram rather than per-unit basis, the subject merchandise (steel in both cases) was effectively

priced by weight. *See* Dingli Case Br. at 14–15 (citing *Forged Stainless Steel Flanges From India*

and *Butt-weld Pipe Fittings from Taiwan* as per-kilogram agency precedents). In *Forged Stainless*

*Steel Flanges From India*, Commerce recited and agreed with the argument that:

> {t}he Department has traditionally used weight as a standard unit measure in
> determining gross unit price because <u>a large number of steel products are most</u>
> <u>commonly priced using weight</u> as the standard measurement. Because weight is so
> commonly used in this manner, many <u>companies track costs based on a weight unit</u>
> <u>measure</u> for determining selling expenses, inputs and other information.

Issues and Decision Memorandum accompanying *Certain Forged Stainless Steel Flanges From*

*India (flanges) From India*, 66 Fed. Reg. 48,244 (Sep. 19, 2001) (final results of antidumping duty

admin. rev.) at cmt. 13 ("*Forged Stainless Steel Flanges From India* IDM"); *see also id.* (noting

"the relevant precedents, both under this order and <u>in steel cases generally</u>, are consistent with

calculating price per unit of weight, not per piece"). *Butt-weld Pipe Fittings from Taiwan*, also a

steel product, recited and agreed with the same language verbatim. *See* Issues and Decision

Memorandum accompanying *Certain Stainless Steel Butt-weld Pipe Fittings From Taiwan; Final*

*Results of Antidumping Duty Administrative Review*, 71 Fed. Reg. 67,098 (Nov. 20, 2006) at cmt.

4 ("*Butt-weld Pipe Fittings from Taiwan* IDM").

Here, virtually all sales of mobile access equipment are priced per unit. *See* Pl. Rebuttal

Br. at 13–14. No commercial purchaser of a scissor lift, boom lift, or vertical mast lift negotiates

sales by weight. Indeed, the GTA data on which Commerce preliminarily relied showed that

17

mobile access equipment sales valued on a per-unit basis represented 99.30% of all global sales. *See id.* at 14.  Disregarding how mobile access equipment is actually sold in the marketplace thus contravenes agency practice and 19 C.F.R. § 351.512(a)(2)(i)'s instruction to measure adequate remuneration by reference to "a market-determined price for the good based on actual transactions."

*Second*, that departure from agency practice was unjustified and inadequately explained by Commerce in the Final Results.  Rather than correct for supposed distortions, as it was intended to, Dingli's proffered shift from per-unit to per-kilogram pricing introduced distortions to the MTAR benchmark of its own.  *See* Pl. Rebuttal Br. at 14–16.  Mobile access equipment is not a commodity like steel billet or aluminum ingot, which are priced by mass; it is finished capital equipment whose value is driven overwhelmingly by engineering content, working height, platform capacity, drive system, control electronics, safety systems, and brand-supported aftermarket service—none of which scale linearly with weight.  Two machines of identical weight can differ substantially in price based on lift height, indoor versus rough-terrain configuration, battery versus diesel powertrain, and so on.  Converting to a per-kilogram benchmark suppresses precisely these value-driving attributes and rewards heavier, lower-technology equipment with an artificially favorable comparison.  In other words, in purporting to correct for supposed distortions caused by product diversity, Dingli's proffered conversion introduced a new distortion of its own. Indeed, given that virtually all mobile access equipment products are sold on a unit basis, by departing from its established practice and valuing mobile access equipment purchases on a per-kilogram basis, Commerce necessarily adopted a benchmarking methodology more distortive than valuing these purchases on a per-unit basis.

Here again Dingli's proffered authorities are instructive.  In both *Forged Stainless Steel Flanges From India* and *Butt-weld Pipe Fittings from Taiwan*, Commerce explained that it was comparing "merchandise which is similar but not identical, where models compared are of different weights (though otherwise similar merchandise)." *Forged Stainless Steel Flanges From India* IDM at cmt. 13; *Butt-weld Pipe Fittings From Taiwan* IDM at cmt. 4.  In other words, Commerce's benchmark methodology effectively controlled for variables across subject merchandise with the exception of weight.  Here, by contrast, Commerce recognizes that mobile access equipment varies across a spectrum of variables.  *See* IDM at 24.  Accordingly, pricing mobile access equipment by weight—when that is not the standard industry measure, and without controlling for any other variable—is an arbitrary elevation of one component that is not the primary driver of product value.

Nonetheless, the Final Results accepted and repeated Dingli's logical fallacy.  Specifically, Commerce recognized that "{b}oth methods"—per-unit and per-kilogram benchmarking—"result in benchmarks that are an average of intrinsically expensive and cheaper models being compared to individual sales of products that are either expensive or cheap and thus result in some distortion stemming from price differences that are attributable to intrinsic differences in the products." *Id*. But Commerce concluded that a per-kilogram measure "at least accounts for price differences attributable to size," *id.*, without addressing the further distortion such an adjustment creates. Because Commerce's explanation runs counter to the evidence before the agency, showing that mobile access equipment is overwhelmingly priced by unit and not by weight, and purports to correct for one distortion while creating another without acknowledgement, the Final Results did not adequately support or explain Commerce's decision to depart from commercial reality in benchmarking the MTAR program.

19

### C. Commerce Erroneously Relied on Dingli's Inland Freight Costs Rather Than Continuing to Benchmark Inland Freight

Finally, in Commerce's LTAR calculations, Commerce erroneously substituted Dingli's inland freight costs for its inland freight benchmark in the Final Results. Commerce preliminarily determined, applying adverse facts available ("AFA"), that for "each of the inputs used in the production of subject merchandise . . . all of the domestic producers that provided Dingli with Ocean freight, off-the-road tires, steel channels, steel angles, diesel engines, liquid carbon dioxide, hydraulic oil, electric motors and motor assemblies and lead-acid batteries during the POR are authorities and that the markets for each of these inputs are distorted." Prelim. Decision Memo at 22. As such, Commerce preliminarily found that "domestic prices in China for said inputs cannot be used as a tier one benchmark." *Id.* To measure the adequacy of remuneration for the provision of those inputs for LTAR, Commerce determined to rely on "world market prices as the tier two benchmark pursuant to 19 CFR 351.511(a)(2)(ii)." *Id.* For inland freight, Plaintiff had "provided the only benchmark on the record, inland freight benchmarks based on the World Bank's Doing Business 2020 – Economy Profile of China," which Commerce relied on to benchmark inland freight costs. *Id.*

In its case brief, Dingli argued that Commerce should revise its inland freight calculation to dispense with a benchmark and rely instead on the "inland freight expense reported by Dingli from its factory to the Shanghai Port." Dingli Case Br. at 2. Dingli argued there was "no evidence on the record that inland freight prices in China are distorted," counseling against the use of "a non-contemporaneous inland freight rate, from three other countries which then attempts to construct a per kg, per km inland freight price using the distance between Dingli and the port." *Id.*

Plaintiff disagreed for two primary reasons. *First*, Commerce had correctly determined that inland freight prices in China are distorted for LTAR purposes and should be benchmarked.

Pl. Rebuttal Br. at 33. That is, pursuant to a lawful application of AFA, Commerce reasonably found the Government of China so heavily involved in the provision of mobile access equipment inputs that neither Dingli's actual costs nor a Chinese market price could serve reliably as an LTAR benchmark. *See generally* Prelim. Decision Memo at 10–12. That finding was consistent both with Commerce's analysis of ocean freight in this review and its calculation of inland freight benchmarks in other China CVD investigations. *See, e.g.*, *id.* at 22 ("{W}e preliminarily determine, as AFA, that all of the domestic producers that provided Dingli with Ocean freight . . . are authorities and that the markets for each of these inputs are distorted."); IDM at cmt. 12 (continuing to benchmark Dingli's ocean freight costs); *see also* Issues and Decision Memorandum accompanying *Multilayered Wood Flooring From the People's Republic of China*, 86 Fed. Reg. 59,362 (Dep't Commerce Oct. 27, 2021) (final results and partial rescission of countervailing duty admin. rev.; 2018) at 85–86 ("we continue to use the World Bank's Doing Business in China 2020 Report as the benchmark source for calculating the inland freight expense used in the benchmark prices").

*Second*, as Plaintiff had explained, "when constructing a tier-two benchmark, the reference to 'a firm' does not mean the respondent. Rather, it refers to a hypothetical firm located in the PRC purchasing" the input in question. Pl. Rebuttal Br. at 17 (quoting *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1374 (Ct. Int'l Trade 2015)). Accordingly, Commerce has a "practice of ordinarily declining to rely upon delivery charge data that is specific to a particular respondent when using a tier-two benchmark{.}" *Beijing Tianhai*, 52 F. Supp. 3d at 1375. And the Federal Circuit has expressly "upheld the Department's practice of ignoring a particular respondent's conditions of purchase when calculating tier-two benchmark prices" for an LTAR

program.  *Id.* at 1374 (citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1274 (Fed. Cir. 2012)).

In the Final Results, Commerce agreed with Dingli that it has a "long-standing practice of relying on the inland freight values reported by the respondents," citing two administrative reviews of a single countervailing duty order from 2023 and 2024.  IDM at 36 & n.118.  Commerce further found, without elaboration, that "there is very little information suggesting distorted inland freight prices in this investigation."  IDM at 36.  Accordingly, Commerce replaced its inland freight benchmark with Dingli's inland freight costs for its final LTAR calculations.  *See id.*

Two agency decisions issued in the two years preceding the Final Results do not establish a "long-standing practice."  *See id.*; *cf.* Issues and Decision Memorandum accompanying *Certain Corrosion-resistant Steel Products From Taiwan*, 84 Red. Reg. 70,937 (Dep't Commerce Dec. 26, 2019) (affirmative final deter. of circumvention inquiry on the antidumping duty order) at cmt. 4 ("{A}s the CIT has found and as the petitioners point out, a decision made in a single instance in a single administrative proceeding does not establish a fixed agency practice.").  And Commerce's one-sentence finding that there is "little information" suggesting inland freight prices were distorted stands in sharp contrast to Commerce's earlier acknowledgement that the Government of China expressly refused to answer questions regarding its participation across a number of industries, including the analogous ocean freight industry specifically.  *See* IDM at cmt. 1.  As such, Commerce's abrupt determination to rely on actual inland freight costs—while benchmarking other comparable inputs, like ocean freight—was arbitrary and thus not in accordance with law.

## V.    CONCLUSION

For the foregoing reasons, we respectfully request that the Court remand the final determination in the underlying administrative review to Commerce consistent with the arguments made in this brief.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.
Theodore P. Brackemyre, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for the Coalition of American Manufacturers of Mobile Access Equipment*

Dated:  June 26, 2026

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Memorandum in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2024), is 6,668 words.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

<u>Timothy C. Brightbill</u>
(Name of Attorney)

*<u>Coalition of American Manufacturers
of Mobile Access Equipment</u>*
(Representative Of)

<u>June 26, 2026</u>
(Date)