**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

|  |  |  |
|---|---|---|
| | x | |
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff / Consolidated Defendant-Intervenor, | : | |
| | : | |
| | : | Consol. Court No. 26-0702 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| - and - | : | |
| | : | |
| ZHEJIANG DINGLI MACHINERY CO., LTD., | : | |
| | : | |
| | : | |
| Defendant-Intervenor / Consolidated Plaintiff. | : | |
| | : | |
| | x | |

## CONSOLIDATED PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Consolidated Plaintiff Zhejiang Dingli Machinery Co., Ltd. ("Dingli") respectfully moves for judgment on the administrative record. For the reasons set forth in the accompanying Memorandum of Law in support of its motion, Dingli requests that the Court determine that the U.S. Department of Commerce's results in *Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2022*, 90 Fed. Reg. 59,492 (Dec. 19, 2025) and as amended in *Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Amended Final Results of Countervailing Duty*

*Administrative Review; 2022*, 91 Fed. Reg. 3121 (Jan. 26, 2026), and the accompanying Issues

and Decision Memorandum, is not supported by substantial evidence on the record and is

otherwise not in accordance with law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

Dated: June 26, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

|  |  |  |
|---|---|---|
| | x | |
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff / Consolidated Defendant-Intervenor, | : | |
| | : | |
| | : | Consol. Court No. 26-0702 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| - and - | : | |
| | : | |
| ZHEJIANG DINGLI MACHINERY CO., LTD., | : | |
| | : | |
| | : | |
| Defendant-Intervenor / Consolidated Plaintiff. | : | |
| | : | |
| | x | |

**ORDER**

Upon consideration of the Motion for Judgment on the Administrative Record filed by Consolidated Plaintiff Zhejiang Dingli Machinery Co., Ltd. ("Dingli") and upon all other papers and proceedings herein, the Court

**ORDERS** that Dingli's Motion is granted; and further

**FINDS** that the contested results of the U.S. Department of Commerce ("Commerce") in *Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2022*, 90 Fed. Reg. 59,492 (Dec. 19, 2025) and as amended in *Mobile Access Equipment and Subassemblies Thereof From the*

ii

*People's Republic of China: Amended Final Results of Countervailing Duty Administrative Review; 2022*, 91 Fed. Reg. 3121 (Jan. 26, 2026), is not supported by substantial evidence on the record, and is not otherwise in accordance with law; and further

**ORDERS** that this matter is remanded to Commerce for reconsideration of the Final Results in accordance with the decision of this Court.

**SO ORDERED.**

_____
Claire R. Kelly, Judge

Dated: _____,
      New York, New York

iii

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | | |
|---|---|---|
| | x | |
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff / Consolidated Defendant-Intervenor, | : | |
| | : | |
| | : | Consol. Court No. 26-0702 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| - and - | : | |
| | : | |
| ZHEJIANG DINGLI MACHINERY CO., LTD., | : | |
| | : | |
| Defendant-Intervenor / Consolidated Plaintiff. | : | |
| | : | |
| | x | |

**MEMORANDUM OF LAW IN SUPPORT OF CONSOLIDATED PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

Dated: January 26, 2026

iv

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................................................i

TABLE OF AUTHORITIES .....................................................................................................ii

STATEMENT PURSUANT TO RULE 56.2.............................................................................1

   A.   Administrative Decision Under Appeal................................................................1

   B.   Reasons For Contesting The Administrative Decision.........................................1

   C.   Issues Presented And Summary Of Argument .....................................................1

     1.   Was Commerce's selection of the tier 2 benchmark for hollow structures unlawful ? ... 1

     2.   Was Commerce's selection of the tier 2 benchmark for hot-rolled steel unlawful?........ 2

STATEMENT OF FACTS .........................................................................................................2

STANDARD OF REVIEW ........................................................................................................6

ARGUMENT...............................................................................................................................7

I.   Commerce's Refusal to Remove Certain HTS Provisions From the Tier 2 Benchmarks Was Contrary to Past Practice, Unsupported by Substantial Evdience, and Otherwise Contrary to Law...............................................................................................................................7

   A. The Benchmark Regime ........................................................................................ 8

   B. The Error In Commerce's Decision.................................................................... 13

     1.   Hollow Structural Shapes ...................................................................... 13

     2.   Hot Rolled Steel Sheet and Plate ........................................................... 20

CONCLUSION.........................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beijing Tianhai Indus. Co. v. United States*,
  52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015) .......................................................... 18, 19

*Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*,
  61 F. Supp. 3d 1306 (CIT 2015) ...................................................................... 10

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ........................................................................................ 6

*Dongbu Steel Co. v. United States*,
  635 F.3d 1363 (Fed. Cir. 2011)........................................................................ 23

*Ferrostaal Metals Corp. v. United States*,
  664 F. Supp. 535 (CIT 1987) ........................................................................... 28

*Gerald Metals, Inc. v. United States*,
  132 F.3d 716 (Fed. Cir. 1997)........................................................................... 6

*Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States*,
  769 F.Supp.3d 1344 (CIT, 2025) ................................................................... 12, 19

*Jiangsu Zhongji Lamination Materials Co. v. United States*,
  745 F. Supp. 3d 1305 (CIT 2024) ..................................................................... 11

*Matsushita Elec. Indus. Co. v. United States*,
  750 F.2d 927 (Fed. Cir. 1984) ........................................................................... 6

*Risen Energy Co. v. United States*,
  570 F. Supp. 3d 1369 (CIT 2022) ..................................................................... 10

*Save Domestic Oil, Inc. v. United States*,
  357 F.3d 1278 (Fed. Cir. 2004).......................................................................... 7

*SKF USA, Inc. v. United States*,
  263 F.3d 1369 (Fed. Cir. 2001)........................................................................... 7

*SKF USA, Inc. v. United States*,
  630 F.3d 1365 (Fed. Cir. 2011).......................................................................... 7

*WelCom Prods., Inc. v. United States*,
  865 F. Supp. 2d 1340 (CIT 2012) ...................................................................... 7

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................... 6

19 U.S.C. § 1677(5)(E)(iv) ...................................................................... 8, 9, 12

**Regulations**

19 C.F.R. § 351.511 ........................................................................... passim

**Administrative Decisions**

*Certain Cold-Rolled Steel Flat Products from Brazil, India, the Republic of Korea, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Brazil and the United Kingdom and Antidumping Duty Orders,*
81 Fed. Reg. 64432 (Sept. 20, 2016) ....................................................................... 26

*Certain Hot-Rolled Steel Flat Products From Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders,*
81 Fed. Reg. 67962 (Oct. 3, 2016) ........................................................................... 26

*Certain Steel Racks and Parts Thereof From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2020,*
88 Fed. Reg. 21,177 (April 10, 2023) ...................................................................... 14

*Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination,*
81 Fed. Reg. 3,110 (Jan. 2, 2016) ............................................................................ 11

*Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2018,*
86 Fed. Reg. 6,866 (Jan. 25, 2021) .......................................................................... 23

*Cold–Rolled Carbon Steel Flat Products From Argentina,*
58 Fed. Reg. 37,062, 37,066 (1993) ......................................................................... 28

*Countervailing Duties; Final Rule,* 63 Fed. Reg. 65,348 (Nov. 25, 1998) .................................... 25

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination,*
83 Fed. Reg. 9274 (Mar. 5, 2017) ..................................................................... 13, 19

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015,* 83 Fed. Reg. 34,828 (July 23, 2018) ................................................................ 10

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Rescission in Part; 2021,*
88 Fed. Reg. 88,575 (Dec. 22, 2024) ........................................................................ 21

*Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017,*
85 Fed. Reg. 76,011 (Nov. 27, 2020) ................................................................. 13, 20

*Wood Mouldings and Millwork Products From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2023,*
91 Fed. Reg. 8408 (Feb. 25, 2026) ........................................................................... 12

Consolidated Plaintiff Zhejiang Dingli Machinery Co., Ltd. ("Dingli") submits this Memorandum of Law to support its Rule 56.2 Motion for Judgment on the Agency Record.

## STATEMENT PURSUANT TO RULE 56.2

### A.    ADMINISTRATIVE DECISION UNDER APPEAL

Dingli seeks review of the U.S. Department of Commerce's ("Commerce") final results of the second administrative review of the countervailing duty ("CVD") order mobile access equipment and subassemblies thereof ("MAE") from the People's Republic of China ("China"), published as *Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2022*, 90 Fed. Reg. 59,492 (Dec. 19, 2025), and as amended in *Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Amended Final Results of Countervailing Duty Administrative Review; 2022*, 91 Fed. Reg. 3121 (Jan. 26, 2026) (collectively "Final Results"), accompanying Issues and Decision Memorandum (December 15, 2025) (**PR 315**) ("IDM").

### B.    REASONS FOR CONTESTING THE ADMINISTRATIVE DECISION

Dingli's reasons for contesting the administrative decision are set forth in the Summary of Arguments below, and in more detail in the Argument section of this Memorandum.

### C.    ISSUES PRESENTED AND SUMMARY OF ARGUMENT

1. **Was Commerce's selection of the tier 2 benchmark for hollow structural shapes unlawful ?**

Yes. Commerce failed to follow its standard of relying on data reflecting the narrowest category of products encompassing the input product in selecting the tier 2 benchmark under 19 C.F.R. § 351.511 for hollow structural shapes. The record demonstrated that Dingli only purchased square and rectangular hollows and Commerce should have limited its benchmark to HTS provisions covering those products.  Instead, Commerce included HTS provisions that were limited to hollow structural shapes of circular cross-sections, in addition to those provisions

1

limited to square/rectangular shapes, using fourteen HTS provisions in total. Since Dingli only purchased and reported square and rectangular hollows, Commerce should have only used those HTS provisions specific these types of hollows in the benchmark. Further, Commerce removed those circular cross section HTS provisions in the original investigation and should have done so here. Commerce's determination was therefore unsupported by substantial evidence and was otherwise contrary to law.

### 2. **Was Commerce's selection of the tier 2 benchmark for hot-rolled steel unlawful?**

Yes. Commerce failed to follow its standard of relying on data reflecting the narrowest category of products encompassing the input product in selecting the tier 2 benchmark under 19 C.F.R. § 351.511 hot-rolled steel sheet and plate. The record demonstrated that Dingli only purchased certain thicknesses of hot-rolled steel plate and Commerce should have limited its benchmark to HTS provisions covering those products. Instead, Commerce included HTS provisions that were limited to cold-rolled steel and other sheet and plate coated and clad in other metals, along with the HTS provisions covering the type of plate Dingli's purchased. In all, twenty-seven HTS provisions were used. In the original investigation, however, Commerce only used HTS provisions specific to Dingli's hot-rolled steel; Commerce should have done so here. Commerce's determination was therefore unsupported by substantial evidence and was otherwise contrary to law.

### STATEMENT OF FACTS

Commerce published its countervailing duty order on MAE from China on December 10, 2021. *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Countervailing Duty Order and Amended Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 70,439 (Dec. 10, 2021).

On February 8, 2024, Commerce initiated the second administrative review of the CVD order on MAE from China, covering the period of review ("POR") from January 1, 2022, through December 31, 2022. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 8,641 (Feb. 8, 2024).

On April 9, 2024, Commerce selected Plaintiff Dingli as the sole mandatory respondent in the review, issuing the company the initial CVD questionnaire shortly thereafter. Among other subsidy programs, the questionnaire sought information on whether Dingli used the following input for less than adequate remuneration ("LTAR") programs:

- Lithium-ion batteries;

- Hot-rolled steel sheet and plate;

- Steel bars;

- Steel beams;

- Hollow structural shapes; and

- Cold-Rolled Steel.

Dingli timely filed its response to the affiliation portion of Commerce's initial CVD questionnaire on April 29, 2024, and on June 5, 2024, timely filed the remainder of its response to Commerce's initial questionnaire, identifying subsidy programs from which the company received benefits during the POR. Among other programs, Dingli reported usage of the LTAR programs covering hot-rolled steel sheet and plate, and hollow structural shapes, identifying all purchases of these inputs during the POR. **CR 8-45 / PR 32-34**.

For its hollow structural shapes purchases, Dingli reported purchasing square and rectangular shaped hollows. *See id*. at Exhibit V.A.3.1b. For its hot rolled steel sheet and plate purchases, in its supplemental questionnaire response Dingli reported that all of its purchases

under this program were for hot rolled steel plate, not sheet, of certain thicknesses. Dingli HRS Supplemental Questionnaire Response at 1-2 (March 31, 2025) (**CR 166-167 / PR 269**).

Plaintiff timely responded to all additional supplemental questionnaires issued by the Department to the company.

Plaintiff submitted timely factual information on December 6, 2024, for Commerce's use in the valuation of the benchmarks under the applicable LTAR subsidy on hot-rolled steel sheet/plate and hollow structural shapes, and other inputs.  **CR 90-93 / PR 98-100**.  In this submission, Plaintiff identified the appropriate HTS provisions for each of these inputs for use in a tier 2 benchmark under 19 C.F.R. § 351.511 using export statistics from various countries via UNComtrade.  Petitioner timely submitted benchmark information on the same day, similarly proposing additional HTS provisions it believed were appropriate for each input for a tier 2 benchmark. **CR 94-109 / PR 101-109**.

Commerce published its Preliminary Results of the administrative review on December 28, 2023.  *Mobile Access Equipment and Subassemblies Thereof from the People Republic of China: Preliminary Results and Rescission, in Part, of the Countervailing Duty Administrative Review; 2022,* 90 Fed. Reg. 15,443 (April 11, 2025) ("Preliminary Results"), along with its accompanying Preliminary Decision Memorandum ("PDM") (**PR 273**), and Preliminary Results Calculations for Zhejiang Dingli Machinery Co. Ltd., dated April 7, 2025 ("Prelim. Calc.") (**CR 168-171 / PR 274-276**).

In its Preliminary Results, Commerce preliminarily found that Plaintiff had received countervailable benefits during the POR for various programs, calculating a preliminary CVD rate of 79.33%.  Prelim. Calc Memo. (**CR 168-171 / PR 274-276**). A vast majority of this rate was the various input for LTAR programs, including hot-rolled steel sheet and hollow structural shapes:

| Provision of Hot-Rolled Steel Sheet and Plate for LTAR | 17.65% |
|---|---|
| Hollow Structural Shapes for LTAR | 12.59% |

*Id.* at Attachment 1.   In calculating the rates for these programs, Commerce applied a tier 2 benchmark under 19 C.F.R. § 351.511 using export prices from UNComtrade under the HTS provisions identified by both Plaintiff and Petitioners:

*Hot Rolled Steel Sheet and Plate, Hollow Structural Shapes, Cold-Rolled Steel, Lead Acid Batteries*

The petitioner and Dingli both provided UN Comtrade data for these inputs.[126]  However, all HS subheadings Dingli uses for hot rolled steel sheet and plate, hollow structural shapes, cold-rolled steel, and lead acid batteries are all already included in the petitioner's benchmarks.[127]  As a result, given both databases are from the same source and the petitioner's data include a wider array of HS subheadings that we find appropriate and representative for each of these inputs, we are relying on the petitioner's UN Comtrade data as a benchmark.

PDM at 24 (**PR 273**). Commerce did not list the HTS codes used for each benchmark but instead referred the parties to Petitioner's benchmark submission.  For hollow structural shapes, the benchmark consisted of export prices under **fourteen** different HTS codes.  For hot-rolled steel plate/sheet, the benchmark consisted of **twenty-seven** different HTS codes.

On May 9, 2025, Plaintiff filed its administrative case brief challenging certain decisions and findings in the Department's Preliminary Results, including, among other things that: (1) the HTS provisions used to calculate the benchmark for hot-rolled steel sheet and plate; and (2) The HTS provisions used to calculate the benchmark for hollowed structural shapes. **CR 181-183 / PR 296-297**.  For each of these LTAR programs, Dingli argued that certain of the HTS provisions Commerce used in the benchmark did not cover the input Dingli purchased and reported to Commerce.

On December 19, 2026, Commerce published its Final Results, assigning Plaintiff a final CVD rate of 32.26%. 90 Fed. Reg. 59,493.  In these Final Results, Commerce accepted some of

5

Plaintiff's arguments and rejected others.  Specifically, for the provision of hot-rolled sheet and plate and hollow structural shapes for LTAR, Commerce accepted certain other calculation arguments Plaintiff raised, which reduced each rates, but did not accept Plaintiff's arguments about the appropriate HTS categories to use in the benchmark:

|  | Prelim | Final |
|---|---|---|
| Provision of Hot-Rolled Steel Sheet and Plate for LTAR | 17.65% | 7.35% |
| Provision of Hollow Structural Shapes for LTAR | 12.59% | 7.89% |

Final Calc Memo at Attachment 1 **(CR 187-188 / PR 317)**; IDM at Cmt 8 (**PR 315**).

Plaintiff limits this court challenge of Commerce's Final Results to the HTS provisions used for the hollow structural shapes and hot-rolled steel plate/sheet benchmarks.

### STANDARD OF REVIEW

The court must hold unlawful any aspect of Commerce's decision-making that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted).

"Despite Commerce's statutory discretion, . . . if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004). "When an agency changes its practice, it is obligated to provide an adequate

6

explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quotation omitted). "If the Department provides 'no reasonable explanation' for changing a practice that it has 'consistently followed,' such a change is an unacceptable agency practice." *WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340, 1344 (CIT 2012).

## ARGUMENT

**I.    COMMERCE'S REFUSAL TO REMOVE CERTAIN HTS PROVISIONS FROM THE TIER 2 BENCHMARKS WAS CONTRARY TO PAST PRACTICE, UNSUPPORTED BY SUBSTANTIAL EVDIENCE, AND OTHERWISE CONTRARY TO LAW**

This court action focuses on the selection of tier 2, world benchmarks, under 19 C.F.R. § 351.511 and 19 U.S.C. § 1677(5)(E)(iv), and Commerce's obligations under the law in making those selections.  Here, Commerce selected tier 2 benchmarks for hot-rolled steel plate and sheet and hollow structural shapes using export quantities and values under *twenty-seven* and *fourteen* different HTS provisions, respectively. In doing so, Commerce failed to properly limit the HTS categories used to derive the benchmark prices to the input types Dingli actually purchased and reported.  These benchmarks consisted both of products Dingli purchased *and* products that Dingli decidedly did not purchase.  By incorporating product types that Dingli did not purchase within each benchmark, Commerce calculated inflated subsidy benefits based on product differences rather than remuneration. Commerce should have instead selected benchmarks using the *narrowest* category of products encompassing the input product, as is required by the statute, regulations and Commerce's clear benchmark selection standards.

For the hollowed structural shapes program, Commerce should have removed any HTS provision that was limited to shapes with a circular cross section.  Dingli only purchased

rectangular or square hollow shapes.

For the hot-rolled steel sheet and plate program, Commerce should have removed HTS provisions that do not match the hot-rolled plate and thickness reported. These include: 1) HTS provisions for cold rolled steel, 2) HTS provisions for hot-rolled plate that does not match the thickness of Dingli's, 3) HTS provisions that do not indicate whether they are hot-rolled or cold rolled and 4) HTS provisions for special types steel not used by Dingli, such as steel coated with tin, coated with lead, coated with plastic, grain-oriented steel, etc.

### A.    THE BENCHMARK REGIME

Input for LTAR programs are governed by 19 U.S.C. § 1677(5)(E)(iv). These programs seek to determine whether inputs provided to the respondent by a government authority are at market prices or whether they are instead provided at below market prices, thereby conferring a benefit to the company. Whether the purchase price is "adequate" is determined by selecting a comparison benchmark price. The difference, if any, is the benefit. The statute instructs:

> (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.
>
> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to *prevailing market conditions* for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, *quality*, availability, marketability, transportation, and other conditions of purchase or sale.

19 U.S.C. § 1677(5)(E)(iv) (emphasis added). Commerce's implementing regulations set forth more specific criteria for identifying the type of prices that could be considered appropriate benchmarks.

Under 19 C.F.R. § 351.511(a)(2) potential benchmarks for LTAR programs are listed in hierarchical order by preference: (1) "a market-determined price for the good or service resulting

from actual transactions in the country in question" (tier 1); (2) "world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability" (tier 3); or (3) "assessing whether the government price is consistent with market principles" (tier 3). *Id*. The benchmark selection in this case was under tier 2, which is not in dispute.

Other than the statute and regulations, there are few guiding principles in benchmark selection. In assessing different benchmark sources on the record and comparing flaws or issues in the data, Commerce must at the outset evaluate the sources to achieve a comparable benchmark that will result in a CVD benefit that is as accurate possible. *See Risen Energy Co. v. United States,* 570 F. Supp. 3d 1369, 1378 (CIT 2022) (explaining that the flaws in a proposed freight source "likely does not add to the accuracy of the benchmark calculation when there is the clearly acceptable Xeneta data available."); s*ee also Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*, 61 F. Supp. 3d 1306, 1341 (CIT 2015) ("import benchmark's 'comparability' means it must bear a reasonably realistic resemblance to the importing market's reality or it will not be in accordance with the statute."). Often, this analysis focuses on the specificity of the benchmark source to the input purchased by the respondent. *See*, *e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), IDM Comment 3 ("Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product, which, in this case, would be the annual IHS Markit data (which reflects prices for aluminum frames, while the Comtrade data encompasses a broader range of aluminum products)."); *see also Certain Uncoated Paper from*

9

*the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016), IDM at 3 ("As noted above, our approach in this regard is consistent with the Department's practice of deriving benchmark prices by grade when such data are available and when the record evidence indicates that the respondent firm purchases the good in question on a grade-specific basis.").

For tier 2 benchmarks specifically, Commerce, as it did here, often turns to world export statistics under certain HTS provisions that match the input being purchased. When selecting benchmarks using different HTS categories, it is Commerce's practice "to rely on data reflecting the **narrowest category of products encompassing the input product**."[1] *See also Jiangsu Zhongji Lamination Materials Co. v. United States*, 745 F. Supp. 3d 1305, 1314 (CIT 2024) (affirming the Department's practice to use the narrowest HTS category that is "most detailed tariff schedule classification covering these products at the internationally harmonized (six-digit) level of specification."); *Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States*, 769 F.Supp.3d 1344 (CIT, 2025) ("In applying § 1677(5)(E)(iv) and § 351.511(a)(2)(ii), Commerce has a practice of 'rely[ing] on data reflecting the narrowest category of products encompassing the input product'…. To that end, where there are sufficient benchmark data on the record and there is sufficient evidence to support the respondent's claim that 'it does not purchase' a certain product, Commerce will not include data for that product in the benchmark calculation"). Indeed, "{w}hen the record demonstrates that a respondent's input purchases are for a specific material, Commerce will use a benchmark that is specific to the purchased input." *Wood Mouldings and Millwork Products From the People's Republic of China: Final Results of*

---

[1] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic ofChina: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018),IDM at Cmt. 3 (emphasis added).

*Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 8408 (Feb. 25, 2026), IDM at

Cmt. 4. Commerce has consistently followed this court approved practice in proceedings

involving multiple HTS provisions.

In *Aluminum Foil from China*, in selecting the tier 2 benchmark for primary aluminum,

Commerce in the preliminary determination used the HTS provision for alloyed aluminum ingot

and the separate HTS provision for unalloyed aluminum ingot together. *Countervailing Duty

Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative

Determination*, 83 Fed. Reg. 9274 (Mar. 5, 2017), IDM at Cmt. 16. However, in the Final

Results, Commerce changed its benchmark, removing the alloyed HTS provision, because the

respondent only purchased unalloyed ingot:

> The benchmark for primary aluminum currently includes unalloyed
> aluminum ingot, HTS 7601.10, and alloyed ingot, HTS 7601.20. Because
> the respondent purchased unalloyed aluminum ingots, consistent with our
> practice, we have revised the benchmark to include only unalloyed
> aluminum ingot, HTS 7601.10, for this final determination.

*Id*. (citing *Coated Paper from Indonesia* and accompanying IDM at Cmt. 11).

Similarly, in *Multilayered Wood Flooring from the People's Republic of China: Final

Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed.

Reg. 76,011 (Nov. 27, 2020), IDM at Cmt 6, Commerce was faced with numerous HTS

provisions to value plywood. In removing certain HTS provisions from the benchmark,

Commerce first underscored its practice "to rely on data reflecting the narrowest category of

products encompassing the input product." *Id*. Commerce then explained:

> We further agree with Baroque Timber that we should not include HS
> 4412.31 ""Plywood; consisting only of sheets of wood (not bamboo), each
> ply 6mm or thinner, with at least one outer ply of tropical wood," in its
> plywood benchmark. Baroque Timber argues that Commerce should
> exclude this HS code as it does not purchase plywood with tropical plies
> and provided sample documentation supporting its claim. While we
> generally agree with the petitioner that perfection is not required when

selecting benchmark information, as noted above, Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product.

*Id.*

In *Jiangsu Senmao Bamboo & Wood Indus. Co.*, 769 F. Supp. 3d at 1374, Baroque Timber, a respondent, argued that HTS 4412.99 consisted of laminated wood, not plywood, and should not have been used in the plywood benchmark.  The court agreed, explaining:

> As stated above, Baroque Timber submitted uncontroverted data in the record that it did not use products covered by HS 4412.99. In addition, the record contains sufficient benchmark data from other HS categories that cover specifically "plywood." IDM at 38 ("The record contains several HS categories of plywood which are considered comparable to the plywood input used by the mandatory respondents."); PDM at 15 (listing the HS categories used to value the plywood benchmark). For those reasons, Commerce's decision to include HS 4412.99 in the plywood for LTAR benchmark calculation is unsupported by substantial evidence.

Finally, in *Certain Steel Racks from China,[2]* Commerce was faced with multiple benchmark options for steel welding wire and steel welding rod.  These included UNComtrade data under: 1) HTS category 831120 (Wire; cored, of base metal, for electric arc-welding); and (2) HTS category 831130 (Coated rods & cored wire, of base metal, for soldering/brazing/welding by flame); as well MEPS[3] data for wire rod.  In using the UNComtrade data and rejecting the MEPs data, Commence explained that "the U.N. Comtrade data are more representative of the steel welding wire and steel welding rod than the MEPS data, because they are limited to materials used for welding applications" and that in contrast "the MEPS data cover broad categories of 'wire rod' and, therefore may include steel inputs that are not used for welding applications."

---

[2] *Certain Steel Racks and Parts Thereof From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 21,177 (April 10, 2023), IDM at Cmt. 2.

[3] MEPs is an online steel market analysis company that, among other things, publishes pricing for certain steel commodities.

12

**B.    THE ERROR IN COMMERCE'S DECISION**

Commerce has a clear standard when selecting benchmarks under tier 2 of 19 C.F.R. § 351.511 "to rely on data reflecting the narrowest category of products encompassing the input product."[4] In its Final Results, when addressing Dingli's arguments to exclude certain HTS provisions for hot-rolled steel and plate, and hollow structural shapes, Commerce failed to reference this standard a single time.  In refusing to follow, or even reference, this standard, Commerce's decision regarding the benchmarks for hot-rolled steel and plate, and hollow structural shapes, is contrary to law and unsupported by substantial evidence.

**1.    Hollow Structural Shapes**

In its Final Results, Commerce used fourteen different HTS provisions in the benchmark for hollow structural shapes.  These included:

| | |
|---|---|
| 730431 | Iron or non-alloy steel (excluding cast iron); seamless, cold-drawn or cold-rolled, tubes, pipes and hollow profiles of **circular cross-section** |
| 730439 | Iron or non-alloy steel (excluding cast iron); seamless, (excluding cold-drawn or cold-rolled), tubes, pipes and hollow profiles of **circular cross-section** |
| 730441 | Steel, stainless; cold-drawn or cold-rolled (cold-reduced), tubes and pipes of **circular cross-section** |
| 730449 | Steel, stainless; (excluding cold-drawn or cold-rolled), tubes pipes and hollow profiles of **circular cross-section** |
| 730451 | Steel, alloy (not stainless steel); seamless, cold-drawn or cold-rolled (cold-reduced), tubes, pipes and hollow profiles of **circular cross-section** |

---

[4] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind Review, in Part; 2023*, 91 Fed. Reg. 35,664 (June 12, 2026), PDM at "Input Benchmarks" ("Consistent with our practice of seeking to maintain product comparability between the benchmark and the products purchased by BYD HK, its cross-owned affiliates, its unaffiliated producers, and VSUN and its cross-owned affiliates, and relying on data that reflect the narrowest category of products encompassing the input products,  we preliminarily determine to use the 2023 weekly prices for polysilicon published by BloombergNEF as it is the most specific and contemporaneous data available on the record to the input products used to produce the products under examination, solar cells and modules. We note that Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product. Thus, for these preliminary results, we preliminarily determine to use the BloombergNEF prices over the Comtrade data, which encompasses a broader range of polysilicon products.").  While we recognize this is a preliminary determination, we highlight this case as it demonstrates the continued use of this standard by Commerce as recent as two weeks ago.").

| | |
|---|---|
| 730459 | Steel, alloy (not stainless steel); (excluding cold-drawn or cold-rolled), tubes, pipes and hollow profiles of **circular cross-section** |
| 730490 | Iron or steel (excluding cast iron); seamless, tubes, pipes and hollow profiles, seamless, n.e.c. in heading no. 7304 |
| 730531 | Iron or steel (excluding cast iron); tubes and pipes (other than line pipe or casing of a kind used for oil or gas pipelines), longitudinally welded, having **circular cross-sections**, external diameter exceeds 406.4mm, (not seamless) |
| 730590 | Iron or steel (excluding cast iron); tubes and pipes n.e.c. in heading no. 7305, having **circular cross-sections**, external diameter exceeds 406.4mm, (not seamless) |
| 730630 | Iron or non-alloy steel (excluding cast iron); tubes and pipes (not seamless), welded, of **circular cross-section**, n.e.c. in chapter 73 |
| 730640 | Steel, stainless; tubes, pipes and hollow profiles, welded, of **circular cross-section**, n.e.c. in chapter 73 |
| 730661 | Iron or steel (excluding cast iron); tubes, pipes and hollow profiles (not seamless), welded, of square or rectangular cross-section, n.e.c. in chapter 73 |
| 730669 | Iron or steel (excluding cast iron); tubes, pipes and hollow profiles (not seamless), n.e.c. in chapter 73, welded, of **non-circular cross-section (not square or rectangular cross-section)** |
| 730690 | Iron or steel (excluding cast iron); tubes, pipes and hollow profiles (not seamless), n.e.c. in chapter 73 |

Dingli Admin Case Brief at Attach. 2 (**CR 181-183, PR 296-297**); Petitioner Benchmark Submission at Exh. 1 (**CR 94-109 / PR 101-109**).[5] These were the same HTS provisions Commerce used in the Preliminary Results. PDM at 24. At Exhibit V.A.3.1b of Dingli's Initial Questionnaire Response, Dingli provided Commerce with a purchase table of all its steel inputs that were subject to LTAR programs. Under the "product description" column, the purchase table clearly shows that all purchases of hollow structural shapes are either "square" or "rectangular" in shape.[6] This reporting was consistent with Dingli's reporting of the same

---

[5] As noted above, neither the IDM nor the Final Calc. Memo list the HTS provisions used for each benchmark. Instead, the decision references the PDM, which in turn only references Petitioner's December 6, 2024, benchmark submission.

[6] Dingli IQR at Exhibit V.A.3.1b (**CR 8-45 / PR 32-34**).

product during the original investigation.  In the original investigation, Commerce removed all

HTS subheadings that reference "circular cross-section" in their description from the benchmark

for hollow structural shapes because Dingli "did not purchase hollow structural shapes with

circular cross-sections." *Certain Mobile Access Equipment and Subassemblies Thereof from the*

*People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg.

57,809 (Oct. 19, 2021), IDM at Cmt. 9 ("MAE investigation").  There are no different facts on

the record in this review that would have warranted a different determination.

In its case brief before the Final Results, Dingli stressed Commerce's practice of

"selecting HTS provisions for benchmarks that reflect the narrowest category of products

encompassing the input product"[7] and its finding in the original investigation, arguing that

Commerce should remove HTS provisions from the hollow structural shape benchmark that had

a circular cross section.  Commerce rejected this argument:

> the legal requirements governing Commerce's selection of benchmarks do
> not require perfection, rather these prices are broad averages that represent
> the overall global market for the input with a comprehensive benchmarks
> that cover a wide range of products. The CIT has held that under 19 CFR
> 351.511(a)(2)(ii), "although Commerce must use benchmark prices for
> merchandise that is *comparable* to a respondent's purchases to satisfy the
> regulation, there is nothing that requires that it use prices for merchandise
> that are *identical* to a respondent's purchases."
>
> For Commerce to require benchmarks to be identical would likely
> disqualify most, if not all, potential benchmarks under consideration in a
> LTAR analysis. While Dingli does point out that benchmark includes
> shapes that are not exactly the same as the ones it purchases, there is no
> information to that effect on the record, nor does Dingli even articulate
> how HSS with a circular cross section is not comparably priced to HSS
> with square, rectangular, or other cross sections or otherwise not
> comparable to those products. Thus while Dingli has established the
> benchmark is not identical, Dingli has failed to demonstrate that the
> benchmark used is not comparable.

Final IDM at Cmt. 8.  The Court should remand this finding for several reasons.

---

[7] Case Brief at Section A.

First, Commerce failed to follow its own standard of using the narrowest category of products on the record. Commerce has an indisputable practice of excluding HTS provisions from the benchmark where those HTS provisions are narrowly limited to inputs that the respondent did not purchase. *See supra* at pp. 8-11. Rather than follow, or even reference this standard, Commerce merely stated that these HTS provisions covering circular hollow shapes could be used because they are comparable, citing to *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1369 (Ct. Int'l Trade 2015). *Id*. at Final IDM at Cmt. 8, n 93.

We agree that the statute does not necessarily require that the benchmark selected be identical to the input purchased in all instances; however, the circumstances of each case dictate the focus of that analysis. In *Beijing Tianhai Indus. Co.*, Commerce was not, like here, faced with a benchmark source that did include the input that was purchased, i.e., steel tube, and a benchmark source that did not include that input. Instead, Commerce was faced with a steel tube benchmark that was limited to certain diameters and a steel tube benchmark that included all diameters. That is, the product plaintiff purchased was included in both benchmark options. Plaintiff, however, attempted to argue that the benchmark with limited diameters was *more* specific to its steel tube inputs and should have been used instead of the benchmark that included all steel tube diameters. Plaintiff did not argue that the second benchmark source did *not include* the steel tube it purchased. The court rejected plaintiff's argument saying that both sources were comparable. Record evidence also demonstrated that Plaintiff purchased steel tube in diameters outside of the allegedly more specific benchmark. Thus, the case did not involve narrow benchmarks that were limited to one product or another and it is therefore inapposite.[8]

---

[8] The Court has distinguished *Beijing Tianhai* on similar grounds: "There, Commerce declined respondent's request that Commerce discard the UN Comtrade Data in favor of respondent's proposed Metal Expert Russian price data because "the respondent did not identify a compelling reason that [Commerce] ought not to use the UN Comtrade data." Id. Here, however, Baroque Timber and Fine Furniture seek to exclude a single HS category based on

16

Unlike in *Beijing Tianhai*, when the record includes HTS provisions that are narrowly defined and include only products not purchased by the respondent, the mountain of cases cited above, plainly demonstrates that Commerce will remove HTS categories from the benchmark when those HTS categories are limited to products the respondent does not purchase. In *Aluminum Foil*, Commerce removed the HTS provision for alloyed aluminum ingot and used only the HTS provision for allowed ingot because the respondent did not purchase alloyed aluminum ingot.[9]  This is no different than removing the HTS provision for circular hollow structures here. Just as unalloyed ingot is not classified in the alloyed ingot provision, square/rectangular hollows are not classified in the circular hollow provisions.

In *Multilayered Wood Flooring from China*, in selecting benchmarks for plywood, Commerce removed certain HTS provisions that included plywood with tropical plies. Commerce explained:

> We further agree with Baroque Timber that we should not include HS 4412.31 ""Plywood; consisting only of sheets of wood (not bamboo), each ply 6mm or thinner, with at least one outer ply of tropical wood," in its plywood benchmark. Baroque Timber argues that Commerce should exclude this HS code as it does not purchase plywood with tropical plies and provided sample documentation supporting its claim.  While we generally agree with the petitioner that perfection is not required when selecting benchmark information,  as noted above, Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product.  The record contains several HS categories of plywood which are considered comparable to the plywood input used by the mandatory respondents. Moreover, the petitioner's contentions of benchmark gamesmanship are unfounded. Record information related to wood types and species stands in favor of selecting benchmarks which, in accordance with Commerce practice, are the narrowest category of products encompassing the input product used by the respondents. Therefore, because there is sufficient plywood benchmark information and there is sufficient evidence supporting Baroque Timber's

---

substantial record evidence that Baroque Timber did not use products covered by that category." *Jiangsu Senmao Bamboo & Wood Indus. Co*., 769 F. Supp. 3d at 1374.

[9] *Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9274 (Mar. 5, 2017), IDM at Cmt. 16

claim that it does not purchase plywood with tropical plies, we have not included HS 4412.31 in the plywood benchmark calculation for Baroque Timber.

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (Nov. 27, 2020), IDM at Cmt. 6: *see also Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 59,209 (Sept. 27, 2010) (finding a species specific benchmark to be more appropriate than a generic timber value); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Rescission in Part; 2021*, 88 Fed. Reg. 88,575 (Dec. 22, 2024), IDM at 22 (unchanged in final) ("Consistent with our practice of seeking to maintain product comparability between the benchmark prices and the products produced by Chint Solar . . . and relying on data that reflect the narrowest category of products encompassing the input products, we are using the world market prices (tier two) published by 2021 PV Insights provided by Chint Solar to derive the world market solar glass benchmark prices because they are contemporaneous, and specific to solar glass.").  These cases make clear that Commerce failed to follow its benchmark selection standard in this case of selecting the narrowest HTS provisions on the record .

Second, Commerce argues that while Dingli demonstrated that circular hollow structures are not identical to its purchase of square and rectangular hollow structures, Dingli did not demonstrate that circular products are "not comparably priced to HSS with square, rectangular, or other cross sections or otherwise not comparable to those products." Final IDM at CMt. 8. This analysis too is wrong. The first step in any benchmark selection process is whether the product is the same or similar to the input being purchased. These products are clearly physically

18

different – one is square/rectangular and the other is circular. These physical differences are significant enough that it causes them to be classified in different HTS provisions. The fact that they are clearly segregated within the HTS establishes their uniqueness. This is enough to discount circular products for the benchmark. To the extent that price is even relevant, clearly there are price differences between the items as the removal of these HTS provisions from the benchmark for hollow structures reduces the *ad valorem* rate for this program.

Third, Commerce states that its decision is consistent with the legal requirement to use "broad averages that represent the overall global market for the input with comprehensive benchmarks that cover a wide range of products." *Id*. At the outset, nowhere in the statue or regulation is this notion expressed. The statute outlines the specific prevailing market conditions that are to be analyzed when selecting a benchmark. It does not reference broad averages, the overall global market, or a wide range of products. The regulation similarly does not endorse a preference for a "broad average" or a price that represents "the overall global market for the input." Instead, 19 C.F.R. § 351.511 first expresses a preference for actual prices of the same input and then, if not available, requires a " world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." The reference to a "world market price" is *not* the same as a price that represents "the overall global market for the input." A "world" price is merely any market price in the world that is outside of the country in question and it is "one commercially available …. price." The regulation next instructs Commerce in how to treat situations where there are multiple world market prices on the record: "the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability"; this is not a *preference* for averages. Indeed, Commerce itself has said that it "cannot allow the practice of using broad averages to overcome Commerce's regulatory obligation to utilize benchmarks that are more comparable if record

information permits it." *Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 6,866 (Jan. 25, 2021), IDM Comment 1.

Finally, the facts in the original investigation and the challenged review were identical for the selection of the benchmark for hollow structural shapes.  In the *MAE Investigation,* Commerce removed HTS provisions with circular sections and in this review, faced with the same facts, refused to do the same. Commerce failed to address this change in its determination without explanation. An arbitrary failure to consider "an important aspect of the problem" gives rise to a presumption of substantial prejudice, and "agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently". *Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1371 (Fed. Cir. 2011). The failure to treat the same factually similar situations the same, and failure to provide any reasoned explanation for Commerce's change, renders Commerce's decision arbitrary and capricious.

In sum, Commerce did not use the narrowest category of products for the hollow structural shapes benchmark and failed to follow its determination from the original investigation.  Commerce's benchmark selection was therefore contrary to law and not supported by substantial evidence.

### 2.    Hot Rolled Steel Sheet and Plate

In its Preliminary Results, for the hot-rolled steel sheet and plate benchmark, Commerce found that the twenty-seven HS subheadings submitted by petitioner to be "appropriate and representative" of hot-rolled steel plate purchased by Dingli  In its brief, Dingli argued that Commerce should have followed its benchmark selection from the original *MAE Investigation* for this program and only use "HTS codes **explicitly stated to be for hot-rolled steel** straight products below 4.75 mm and all HTS codes for **hot-rolled steel** in coils." *MAE Investigation* at

Cmt. 7b. (emphasis added).  Dingli further argued that that all of its purchases under this

program were for hot-rolled steel plate and that the Department should therefore remove any

HTS provisions that do not match hot-rolled steel plate and the thickness reported.  Dingli HRS

Supplemental Questionnaire Response at 1-2 (March 31, 2025) (**CR 166-167 / PR 269).**  Dingli

argued for the following HTS provisions should be excluded from the analysis:

- HTS 7225.50 and 7226.92 – which are for "cold-rolled" steel.  Dingli's cold rolled steel was reported in response to the cold-rolled steel program, not this program.

- HTS provisions that do not match the thicknesses Dingli reported, or that do not include thicknesses.

- HTS provisions that do not indicate whether they are for hot-rolled or cold-rolled steel.

- HTS provisions for special types steel not used by Dingli, such as steel coated with tin, coated with lead, coated with plastic, grain-oriented steel, etc.

Dingli Brief at Attachment 2 (for a full listing of the HTS provisions the Department used and

identifies which HTS provisions should be excluded from the benchmark) (**CR 181-183 / PR

296-297).**

Commerce rejected these arguments in the final arguing that:

> exact sizes do not need to be met for an input benchmark to be comparable as Commerce benchmark is for what a hypothetical respondent would pay, not what Dingli exactly purchased.

> Furthermore, many of the details Dingli relies on to differentiate its purchases from HS subheadings used in the benchmark are not corroborated by the record. While Dingli argues that these details are now, the exact thicknesses or exact kind of metal of Dingli's purchases are not clear in their response.  Furthermore, Dingli claims that any HS provisions that include a reference to "cold-rolled" steel or do not include a reference to "hot-rolled" steel should be excluded from the benchmark.  We disagree. In the excerpts of HS Chapter 72 provided in Dingli's own benchmark submission, any flat-rolled steel sheet or plate product is going to be hot-rolled, regardless of whether it subsequently undergoes cold-rolling or additional cladding, plating, or coating.  As such, for an HS category to be representative of hot-rolled steel sheet or plate, it is not necessary for it specifically to list *hot-rolled* in the tariff line description.

21

Final IDM at Cmt. 8.  There are several errors in analysis requiring reversal.

First, as with hollow structures, the reference to the *Beijing Tianhai* case is inapposite.  In the original investigation, Commerce specifically limited the benchmark to **"hot-rolled steel straight products below 4.75 mm and all HTS codes for hot-rolled steel in coils."** Thus, Commerce was limiting the benchmark to the HTS provisions with the narrowest category of products in previous segments of this proceeding.  That standard should have been followed here.

Second, Commerce misstates the reference to a "hypothetical respondent" and the selection of the benchmark.  The reference to the availably of the benchmark to purchasers to the country in question in the regulation is not about the *specificity* of the benchmark selection, it is about the *source* and the *market*.  That is, even if the benchmark was identical to the input, if it would not be available to purchasers in the target country, in cannot be used. The *Preamble* instructs:

> We will consider whether the market conditions in the country are such that it is reasonable to conclude that the purchaser could obtain the good or service on the world market. For example, a European price for electricity normally would not be an acceptable comparison price for electricity provided by a Latin American government, because electricity from Europe in all likelihood would not be available to consumers in Latin America.

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,377 (Nov. 25, 1998). Before getting to the availability analysis, Commerce's first step in its benchmark selection analysis is first whether the benchmark is consistent with certain prevailing market conditions, which includes quality (i.e., specificity).  Availability cannot trump specificity.

Third, the use of cold-rolled products in the hot-rolled benchmark is similarly unreasonable and unsupported by substantial evidence. This proceeding involves LTAR

programs on both cold-rolled steel and hot-rolled steel as two separate and distinct programs. Commerce analyzed each of these programs as separate programs going through the statutory factors for each.  PDM at 28, 29, 32 (**PR 273**). Dingli reported its cold rolled steel purchases under the cold rolled program and hot rolled steel plate under the hot rolled steel program.  These are clearly different products with different uses[10] and benchmarks for one cannot be benchmarks for the other. Indeed, while both products may start with a hot-rolling process, cold-rolling is a significant process that results in the substantial transformation of hot-rolled sheet into a different product:

> The issue concerning the country of origin/substantial transformation of cold-rolled flat-rolled steel produced from hot-rolled coils has been previously addressed in Headquarters' rulings 080277 dated September 21, 1987 and 089538 dated August 7, 1991. It was held in both these rulings that the cold-rolling process alters the physical and mechanical properties of the steel, that hot-rolled and cold-rolled flat-rolled steel are commercially distinguishable and marketable to different groups and that the cold-rolling processing operations significantly increased the value/cost of the steel product. The cold-rolled flat-rolled steel was found to meet the substantial transformation test, that is, it has a name, character, and use different from that possessed by the hot-rolled flat-rolled steel. Both rulings held that the steel became a product of the country in which the cold-rolling occurred.

NY H84171.

Fourth, Commerce used numerous HTS provisions which were clad or coated in other metals including tin, zinc, lead, aluminum, plastics, etc., or consisted of special steel (e.g., high-speed steel):

---

[10] Indeed, hot rolled steel and cold rolled steel are always the subject of separate AD/CVD petitions and investigations.  *See, e.g.,Certain Hot-Rolled Steel Flat Products From Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders*, 81 Fed. Reg. 67962 (Oct. 3, 2016);*Certain Cold-Rolled Steel Flat Products from Brazil, India, the Republic of Korea, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Brazil and the United Kingdom and Antidumping Duty Orders*, 81 Fed. Reg. 64432 (Sept. 20, 2016);

| 721011 | Iron or non-alloy steel; flat-rolled, width 600mm or more, plated or coated with tin, thickness of 0.5mm or more |
| 721012 | Iron or non-alloy steel; flat-rolled, width 600mm or more, plated or coated with tin, thickness of less than 0.5mm |
| 721020 | Iron or non-alloy steel; flat-rolled, width 600mm or more, **plated or coated with lead**, including terne-plate |
| 721030 | Iron or non-alloy steel; flat-rolled, width 600mm or more, electrolytically plated or coated with zinc |
| 721041 | Iron or non-alloy steel; flat-rolled, width 600mm or more, corrugated, plated or coated with zinc (not electrolytically) |
| 721049 | Iron or non-alloy steel; flat-rolled, width 600mm or more, (not corrugated), plated or coated with zinc (not electrolytically) |
| 721050 | Iron or non-alloy steel; flat-rolled, width 600mm or more, plated or coated with chromium oxides or with chromium and chromium oxides |
| 721061 | Iron or non-alloy steel; flat-rolled, width 600mm or more, plated or coated with aluminium zinc-alloys |
| 721069 | Iron or non-alloy steel; flat-rolled, width 600mm or more, plated or coated with aluminium, other than plated or coated with aluminium zinc-alloys |
| 721070 | Iron or non-alloy steel; flat-rolled, width 600mm or more, painted, varnished or coated with plastics |
| 721090 | Iron or non-alloy steel; flat-rolled, width 600mm or more, plated or **coated with materials** n.e.c. in heading no. 7210 |
| 721190 | Iron or non-alloy steel; flat-rolled, n.e.c. in heading no. 7211, width less than 600mm |
| 722611 | Steel, alloy; flat-rolled, width less than 600mm, **of silicon-electrical steel, grain-oriented** |
| 722619 | Steel, alloy; flat-rolled, width less than 600mm, of silicon-electrical steel, other than grain-oriented |
| 722620 | Steel, alloy; flat-rolled, width less than 600mm, **of high speed steel** |
| 722691 | Steel, alloy; flat-rolled, width less than 600mm, (excluding silicon-electrical or high speed steel), hot-rolled |
| 722699 | Steel, alloy; flat-rolled, width less than 600mm, n.e.c. in item no. 7226.9 |

Dingli Admin Case Brief at Attach. 2 (**CR 181-183, PR 296-297**); Petitioner Benchmark

Submission at Exh. 1 (**CR 94-109 / PR 101-109**). There is no evidence on the record that

Dingli's purchases of hot rolled sheet include further processing such as cladding or coating with

different metals and products or that they consist of different steel. There is similarly no evidence

that these more further processed product are "comparable" To the contrary, this further

processing also creates products different than the product Dingli purchases. *See e.g., Cold–*

24

*Rolled Carbon Steel Flat Products From Argentina,* 58 Fed. Reg. 37,062, 37,066 (1993) (finding that galvanizing is a bonding process which changes the character and use of the sheet, therefore, a cold-rolled sheet that is galvanized in a subject country is substantially transformed into a product of that country); *Ferrostaal Metals Corp. v. United States*, 664 F. Supp. 535, 541 (CIT 1987) ("the continuous hot-dip galvanizing process effects changes in the name, character and use of the processed steel sheet, the Court holds that the changes constitute a substantial transformation and that hot-dipped galvanized steel sheet is a new and different article of commerce from full hard cold-rolled steel sheet.").

In sum, Commerce did not use the narrowest category of products for the hot-rolled steel sheet and plate benchmark and failed to follow its determination from the original investigation. Commerce's benchmark selection was therefore contrary to law and not supported by substantial evidence.

## CONCLUSION

For the reasons discussed above, Dingli requests that this Court hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law, and remand the *Final Results* with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*

Andrew T. Schutz
Jordan C. Kahn
Michael S. Holton

25

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated:  June 26, 2026

**<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Baroque Timber Industries (Zhongshan) Co., Ltd.'s and Riverside Plywood Corporation's Memorandum of Law in Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 7,437 words, less than the 14,000 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz

*Counsel to Plaintiff*

Dated: June 26, 2026

15269883_1