**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,<br>Plaintiff<br>v.<br>THE UNITED STATES,<br>Defendant,<br>and<br>ZHEJIANG DINGLI MACHINERY CO., LTD.,<br>Defendant-Intervenor. | **PUBLIC VERSION**<br><br>**BPI Omitted at page 24**<br><br>Before: Claire R. Kelly, Judge |
| ZHEJIANG DINGLI MACHINERY CO., LTD.,<br>Plaintiff<br>v.<br>THE UNITED STATES,<br>Defendant,<br>and<br>COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,<br>Defendant-Intervenor. | Consol. Court No. 26-00702 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OLIVER J. MCDONALD
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 305-0168
Oliver.J.McDonald@usdoj.gov

Of Counsel:

BRIEN STONEBREAKER
Attorney
Department of Commerce

## TABLE OF CONTENTS


STATEMENT PURSUANT TO RULE 56.2 .....2

I. Administrative Determination Under Review .....2

II. Issues Presented for Review .....2

STATEMENT OF FACTS .....3

A. Commerce's administrative review and preliminary results and the parties' subsequent submissions .....3

B. Commerce's final results .....6

C. The amended final results .....8

SUMMARY OF ARGUMENT .....8

ARGUMENT .....10

I. Standard of Review .....10

II. Commerce's MTAR and LTAR Benchmarks Appropriately Accounted for Record Evidence of the Distorted Chinese Market .....11

A. Given the distorted Chinese market, Commerce lawfully selected a world-market benchmark for the equipment .....11

B. Commerce's weight-based metric for equipment price was supported by substantial evidence .....14

C. Commerce reasonably used Dingli's inland freight expenses .....16

III. Commerce Selected Comparable HS Subheadings as LTAR Benchmarks .....18

A. Comparable prices and the narrowness of benchmarks .....19

B. Hollow structural shapes .....22

C. Steel sheet and plate .....24

CONCLUSION .....26

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) ... 10

*Baroque Timber Industries (Zhongshan) Co., Ltd. v. United States*,
837 F. Supp. 3d 1314 (Ct. Int'l Trade 2026) ... 19

*Beijing Tianhai Indus. Co. v. United States*,
52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015) ... 18

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ... 14

*Consolo Edison Co. v. NLRB*,
305 U.S. 197 (1938) ... 10

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ... 10

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012) ... 19

*GPX Int'l Tire Corp. v. United States*,
942 F. Supp. 2d 1343 (Ct. Int'l Trade 2013) ... 16

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States,*
769 F. Supp. 3d 1344 (Ct. Int'l Trade 2025) ... 19, 22

*Jiaxing Bro. Fastener Co., Ltd. v. United States*,
822 F.3d 1289 (Fed. Cir. 2016) ... 15, 18

*Mosaic Co. v. United States*,
160 F.4th 1340 (Fed. Cir. 2025) ... 11, 15, 16

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) ... 10

*Rhone Poulenc, Inc. v. United States*,
738 Fed. Supp. 541 (Ct. Int'l Trade 1990) ... 14

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*,
605 U.S. 168 (2025) ... 11

*SKF USA Inc. v. United States*,
630 F.3d 1365 (Fed. Cir. 2011) ... 23, 25

*SolarWorld Ams. v. United States*,
910 F.3d 1216 (Fed. Cir. 2018) ... 25

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) ... 10

*Wheatland Tube Co. v. United States*,
161 F.3d 1365 (Fed. Cir. 1998) ........ 10

*Yama Ribbons & Bows Co., Ltd. v. United States*,
719 F. Supp. 3d 1388 (Ct. Int'l Trade 2024) ........ 17

**STATUTES**

5 U.S.C. § 706(2) ........ 10

19 U.S.C. §
1516a(b)(1)(B)(i) ........ 10
1677 ........ 15
1677(5)(B) ........ 4
1677(5)(E)(iv) ........ 12
1677e(b) ........ 12

**REGULATIONS**

19 C.F.R. §
351.511 ........ 14, 15, 17
351.511(a)(2) ........ 12, 13
351.511(a)(2)(ii) ........ 5
351.511(a)(2)(ii) ........ 14
351.511(a)(2)(v) ........ 14
351.512 ........ 13, 15
351.512(a)(2)(i) ........ 6, 15
351.512(a)(2)(iii) ........ 14

**ADMINISTRATIVE DETERMINATIONS**

*Certain Steel Racks and Parts Thereof From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Rev*iew; 2020,
88 Fed. Reg. 21,177 (Dep't of Commerce Apr. 10, 2023) ........ 21

*Countervailing Duty Investigation of Certain Aluminum Foil From the People's Republic of China: Final Affirmative Det*ermination,
83 Fed. Reg. 9,274 (Dep't of Commerce Mar. 5, 2018) ........ 20, 23

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Rev*iew; 2015,
83 Fed. Reg. 34,828 (Dep't of Commerce July 23, 2018) ........ 21

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
89 Fed. Reg. 8,641 (Dep't of Commerce Feb. 8, 2024) ........ 3

*LSPTVs from China*,
90 Fed. Reg. 26,536 (June 23, 2025) ........ 17

*Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Amended Final Results of Countervailing Duty Administrative Rev*iew; 2022, 91 Fed. Reg. 3,121 (Dep't of Commerce Jan. 26, 2026) ............................................................2

*Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Results of Countervailing Duty Administrative Rev*iew; 2022, 90 Fed. Reg. 59,492 (Dep't of Commerce Dec. 19, 2025) ........................................................ 2

*Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Preliminary Results and Rescission, In Part, of the Countervailing Duty Administrative Rev*iew; 2022, 90 Fed. Reg. 15443 (Dep't of Commerce April 11, 2025) .........................................................4

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Rev*iew; 2017, 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020) ................................................20, 22

*Wood Mouldings and Millwork Products From the People's Republic of China: Final Results of Countervailing Duty Administrative Rev*iew; 2023, 91 Fed. Reg. 8,408 (Dep't of Commerce Feb. 23, 2026) ..........................................................21

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,<br>Plaintiff<br><br>v.<br><br>THE UNITED STATES,<br>Defendant,<br><br>and<br><br>ZHEJIANG DINGLI MACHINERY CO., LTD.,<br>Defendant-Intervenor. | **PUBLIC VERSION**<br><br>**BPI omitted at page 24**<br><br>Before: Claire R. Kelly, Judge |
| ZHEJIANG DINGLI MACHINERY CO., LTD.,<br>Plaintiff<br><br>v.<br><br>THE UNITED STATES,<br>Defendant,<br><br>and<br><br>COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,<br>Defendant-Intervenor. | Consol. Court No. 26-00702 |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 56.2 of the Court's Rules, defendant, the United States, respectfully submits this response in opposition to the motions for judgment on the agency record filed by plaintiffs Coalition of American Manufacturers of Mobile Access Equipment (the Coalition) and Zhejiang Dingli Machinery Co., Ltd. (Dingli). *See* ECF Nos. 26 (Coalition MJAR), 27 (Dingli MJAR). In their motions, plaintiffs challenge the final results of the United States Department of Commerce's administrative review of the countervailing duty order covering mobile access equipment from China. We demonstrate below that plaintiffs' motions should be denied because Commerce's determination is supported by substantial evidence and is otherwise lawful.

## STATEMENT PURSUANT TO RULE 56.2

### I. Administrative Determination Under Review

The Coalition and Dingli challenge certain aspects of Commerce's final results of the second administrative review of the countervailing duty order on mobile access equipment and subassemblies thereof (equipment) from the People's Republic of China (China). *See Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2022*, 90 Fed. Reg. 59,492 (Dep't of Commerce Dec. 19, 2025) (P.R. 318), and the accompanying Issues and Decision Memorandum (P.R. 315) (IDM); as amended by *Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Amended Final Results of Countervailing Duty Administrative Review; 2022*, 91 Fed. Reg. 3,121 (Dep't of Commerce Jan. 26, 2026) (P.R. 325) and the accompanying Ministerial Error Allegations Memorandum (Jan. 21, 2026) (P.R. 323) (collectively, Final Results). The period of review is January 1, 2022, through December 31, 2022.

### II. Issues Presented for Review

1. Whether Commerce lawfully selected world-market data as the equipment price benchmark after finding that Chinese transaction prices were distorted and finding that alternative pricing information were unreliable.

2. Whether Commerce's decision to use a "per-kilogram" pricing metric for the equipment, as opposed to a "per-unit" metric, was supported by substantial evidence.

3. Whether Commerce reasonably selected Dingli's reported inland freight costs as an input for its less-than-adequate-remuneration calculation.

4. Whether the HS subheadings Commerce selected for the hollow structural shapes input were comparable to those reported by Dingli.

5. Whether the HS subheadings Commerce selected for steel sheet and plate were comparable to those reported by Dingli.

## STATEMENT OF FACTS

### A. Commerce's administrative review and preliminary results and the parties' subsequent submissions

Commerce initiated this administrative review on February 8, 2024, and selected Dingli for individual examination on April 9, 2024, based on its volume of entries of subject merchandise during the period of review. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 8,641, 8,647 (Dep't of Commerce Feb. 8, 2024) (P.R. 8); Respondent Selection Memorandum (C.R. 4) (P.R. 16). It issued initial questionnaires on April 15, 2024[1], supplemental questionnaires later that year[2], received proposed benchmark information in December 2024, and received supplemental benchmark information in March 2025.[3]

[1] Initial CVD Questionnaire (April 15, 2024) (P.R. 17) (Initial Questionnaire); Dingli Initial Affiliation Response (Apr 29, 2024) (C.R. 5–6) (P.R. 19) (Dingli Affiliation Response); Dingli Initial Questionnaire Response (June 5, 2024) (C.R. 8–46) (P.R. 32–34) (Dingli IQR); Government of China (GOC) Initial Questionnaire Response (June 12, 2024) (C.R. 47–75) (P.R. 35–62) (GOC IQR).

[2] Dingli Affiliation Supplemental Questionnaire (July 15, 2024) (C.R. 77) (P.R. 75–76); Dingli Affiliation Supplemental Response (Aug. 5, 2024) (C.R. 78–88) (P.R. 82); Dingli Section III Supplemental Questionnaire (Nov. 29, 2024) (C.R. 89) (P.R. 92); GOC Supplemental Questionnaire (Dec. 5, 2024) (P.R. 110); Dingli Supplemental Questionnaire Response (Dec. 9, 2024) (C.R. 110–17) (P.R. 111); GOC Supplemental Questionnaire Response (Dec. 20, 2024) (P.R. 119–21).

[3] Dingli Benchmark Submission (Dec. 6, 2024) (C.R. 90) (P.R. 98); Coalition Benchmark Submission (Dec. 6, 2024) (C.R. 94) (P.R. 101); Coalition Final Benchmark Submission (Mar. 6, 2025) (P.R. 136–142); Dingli HRS Supplemental Questionnaire (Mar. 28, 2025) (C.R. 161) (P.R. 267); Dingli HRS Supplemental Questionnaire Response (Mar. 31, 2025) (HRS Response) (C.R. 166–67) (P.R. 269).

On July 12, 2024, the Coalition submitted a new subsidy allegation claiming that GOC purchased equipment for more than adequate remuneration (MTAR), and Commerce initiated an examination on December 20, 2024.[4] It subsequently issued new questionnaires related to the new allegation.[5]

On April 11, 2025, Commerce published its preliminary results. *Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Preliminary Results and Rescission, In Part, of the Countervailing Duty Administrative Review; 2022*, 90 Fed. Reg. 15443 (Dep't of Commerce April 11, 2025) (P.R. 278); *see also* Preliminary Decision Memorandum (PDM) (P.R. 273); Preliminary Calculation Memorandum (C.R. 168–71) (P.R. 274–76). Among other things, Commerce determined that the market for the equipment in China was distorted and that prices from the Chinese market could not be used. Commerce's questionnaire for the Government of China (GOC) had inquired about, among other things, "information concerning the consumption market in China" for the equipment "to determine whether the customer base available" to Dingli "was determined by market forces." PDM at 14; *see* GOC NSA Questionnaire Response (Mar. 3, 2025) (C.R. 121) (P.R. 135) at 9. The questionnaire asked about government buyers and whether Dingli's customers were "authorities" within the meaning of 19 U.S.C. § 1677(5)(B). *Id.* at 14–15. GOC repeatedly responded that

---

[4] Coalition New Subsidy Allegations (July 12, 2024) (P.R. 70–74); Coalition NSA Supplemental Questionnaire Response (Nov. 4, 2024) (P.R. 91); NSA Initiation Memorandum (Dec. 20, 2024) (P.R. 118).

[5] Dingli NSA Questionnaire (Feb. 13, 2025) (P.R. 124); Dingli NSA Questionnaire Response (Mar. 3, 2025) (C.R. 118–120) (P.R. 134); GOC NSA Questionnaire Response (Mar. 3, 2025) (C.R. 121) (P.R. 135); Dingli NSA Supplemental Questionnaire (Mar. 5, 2025) (C.R. 153) (P.R. 150); Dingli NSA Supplemental Response (Mar. 10, 2025) (C.R. 154) (P.R. 151); Dingli Second NSA Supplemental Questionnaire (Mar. 12, 2025) (C.R. 155) (P.R. 208); GOC NSA Supplemental Questionnaire (Mar. 12, 2025) (C.R. 156) (P.R. 260); Dingli Second NSA Supplemental Response (Mar. 12, 2025) (C.R. 157) (P.R. 226); GOC NSA Supplemental Response (Mar. 21, 2025) (C.R. 160) (P.R. 260).

Dingli did not sell merchandise "to any level of government" during the period of review, which contradicted Dingli's own report that it had sold equipment to state-owned entities. *Id.* (quoting GOC NSA Questionnaire Response (Mar. 3, 2025) (C.R. 121) (P.R. 135) at 88). Given an opportunity to clarify, GOC declined to do so, instead referring Commerce to Dingli's response. *Id.* (citing GOC NSA Supplemental Questionnaire Response (Mar. 21, 2025 (C.R. 160) (P.R. 260) at 9). Commerce preliminarily determined that GOC "failed to cooperate by not acting to the best of its ability to comply with our request for information," determined that "an adverse inference is warranted," and that "prices from actual transactions involving buyers and sellers in China are significantly distorted such that they cannot be used as a tier one benchmark." *Id.* It found that using a tier two benchmark under 19 C.F.R. § 351.511(a)(2)(ii) was therefore warranted for equipment price in its MTAR calculation. *Id.*

Commerce also made preliminary determinations about which benchmarks to use for certain inputs in its less-than-adequate remuneration (LTAR) calculation. Both Dingli and the Coalition suggested UN Comtrade data for inputs like hollow structural shapes and steel sheet and plate, though Dingli argued that Commerce should use a narrower range of HS subheadings than the Coalition. PDM at 24. Commerce preliminarily decided to use the Coalition's HS subheadings as the benchmarks for those inputs because they "include a wider array of HS subheadings" that were "appropriate and representative for each of these inputs." PDM at 24. For the inland freight input, Commerce relied on the only benchmark in the record, data from the World Bank provided by the Coalition. PDM at 25.

The parties subsequently provided rebuttal factual information regarding benchmark data for equipment prices.[6] In May 2025, the parties submitted briefs on contested issues.[7]

**B. Commerce's final results**

On December 19, 2025, Commerce published its final results assigning Dingli a total subsidy rate of 32.26 percent. 90 Fed. Reg. at 59,493. The accompanying Issues and Decision Memorandum (IDM) explained its resolution of the contested issues.

*Equipment prices in China.* Commerce continued to find that the market for the equipment in China was distorted. IDM at 9–10. Specifically, it recounted GOC's repeated refusal to respond to Commerce's questions and that, "{g}iven these failures to cooperate, it is necessary to apply {adverse facts available} to prevent the potential for the GOC and the respondent to benefit from non-cooperation." *Id.* (citing GOC NSA Questionnaire Response (Mar. 3, 2025) (C.R. 121) (P.R. 135) at 88; GOC NSA Supplemental Questionnaire Response (Mar. 21, 2025) (C.R. 160) (P.R. 260) at 9).

While the Coalition maintained that Commerce should use quotes from Chinese marketplaces as benchmark prices, then, Commerce continued to reject that suggestion. *Id.* at 25. Commerce stated its "strong preference not to rely on price quotes" because they "do not represent actual transaction prices." *Id.* Regardless, it also maintained that the Chinese market for the equipment was distorted and that, even if it were to take the Coalition's suggestion to apply the recently promulgated regulation regarding MTAR (19 C.F.R. § 315.512(a)(2)(i)), it would still disregard the Chinese marketplace quotes because it had found there to be substantial

[6] Coalition Rebuttal Information on Global Trade Atlas Benchmark Data (Apr. 17, 2025) (P.R. 279, 284); Dingli Rebuttal Factual Information (C.R. 172–78) (P.R. 280–83).

[7] Coalition Case Br. (C.R. 184) (P.R. 300); Dingli Case Br. (C.R. 181–83) (P.R. 296–97); Coalition Rebuttal Br. (C.R. 186) (P.R. 306).

government involvement in the market. *Id.* Commerce therefore used the only acceptable data in the record, the UN Comtrade data provided by Dingli. *Id.*

*Price per kilogram*. After considering the available metrics for equipment sales price, Commerce determined that price per kilogram struck the right balance. Commerce noted that comparing prices "model-to-model" might be the "best" comparison, but that the information required for that comparison was not in the record. *Id.* at 24. It further acknowledged that the two remaining proposed methods—measuring price per unit or per kilogram—both resulted in "some distortion stemming from price differences that are attributable to intrinsic differences in the products." *Id.* Ultimately, it selected the per-kilogram metric because it "at least accounts for price differences attributable to size." *Id.*

*Inland freight prices*. Commerce followed its "long-standing practice of relying on the inland freight values reported by the respondents." IDM at 36. While the Coalition argued that the "widespread pricing distortions in the Chinese economy" made it "imperative" that Commerce instead refer to data from the World Bank, Commerce noted that the Coalition's brief did not cite any evidence that Dingli's inland freight prices were distorted. *Id.* at 35–36.

*Hollow structural shapes*. For its LTAR calculation, Commerce decided to use a number of HS subheadings for hollow structural shapes, though Dingli argued that Commerce should only use those subheadings for rectangular and square cross-sections because it had not reported using hollow structural shapes with circular cross-sections. *Id.* at 27–28. Commerce pointed out that requiring benchmarks that were "identical" to inputs that Dingli uses "would likely disqualify most, if not all, potential benchmarks under consideration in a LTAR analysis." *Id.* at 28. And, it found that Dingli had not shown that inputs with a circular cross-section were "not comparable" in price. *Id.* In the end, Commerce found that the HS subheadings with circular

cross-sections were "comparable" and that it was not under legal obligation to select subheadings that were "identical" to Dingli's reported inputs. *Id.*

*Steel*. For its LTAR calculation, Commerce determined to use a number of HS subheadings of rolled steel as an input. *Id.* at 26–27. While Dingli claimed that it only used products found in a subset of those subheadings, Commerce noted that needed to use benchmark prices that were "comparable" to a respondent's purchases and did not need to use the "identical" HS subheadings. *Id.* at 26. Commerce further observed that "the exact thickness or exact kind of metal" Dingli used was "not clear in {Dingli's} response," and its demand to narrow the HS subheadings for that input was "not corroborated by the record." *Id.* at 27 (citing Dingli HRS Supplemental Questionnaire Response (Mar. 31, 2025) (HRS Response) (C.R. 166–67) (P.R. 269), Exhibit SD-1).

### C. The amended final results

Commerce subsequently received timely ministerial error allegations and found that it had made a ministerial error regarding the calculation of the inland freight input. Ministerial Error Allegations Memorandum (Jan. 21, 2026) (P.R. 323) at 1–3. It accordingly issued a notice of amended final results regarding the corrected calculations resulting in a subsidy rate of 33.10 percent. 91 Fed. Reg. at 3,122 (P.R. 325).

## SUMMARY OF ARGUMENT

After a 20-month-long administrative review in which Commerce evaluated numerous submissions and followed up with the parties on particular issues of interest, Commerce assigned a subsidy rate of 33.10 percent. As set out in the issues and decision memorandum, Commerce thoughtfully evaluated the disputed issues and reached reasons conclusions based on the record evidence before it. The challenged determinations are supported by substantial evidence and otherwise in accordance with law, and plaintiffs do not show otherwise.

The Coalition challenges two aspects of the MTAR analysis. While it does not dispute that equipment prices in the Chinese market are distorted, it nevertheless insists that Commerce should have used price quotes from that distorted marketplace. Commerce rightly disregarded those sources and instead relied upon world market sources for equipment price. It also asserts that Commerce should have evaluated equipment price on a "per-unit" basis rather than "per-kilogram," stating that the "per-unit" approach would be less distortive. But Commerce acknowledged that neither approach was ideal, but ultimately chose the one which, in its view, was less distortive. That was all that was required, and its decision was supported by substantial evidence.

The Coalition and Dingli challenge three aspects of Commerce's LTAR analysis. First, the Coalition claims that, since Commerce found that certain aspects of the Chinese marketplace were distorted, it should have also found that the market for inland freight was distorted and declined to use Dingli's actual inland freight expenses in its analysis. But Commerce rightly pointed out that the record did not support the Coalition's claim that the inland freight expenses were distorted.

Dingli challenges two of the tier-two benchmarks used in Commerce's analysis, arguing that Commerce should have narrowed applicable HS subheadings to those products that it claimed to use in its own production. For hollowed structural shapes, Dingli contends that subheadings for products with circular cross-sections were not comparable to its own inputs, but it does not explain why. Further, its insistence that Commerce must use the "narrowest" categories available is a red herring. And while it maintains that it does not use certain types of

steel plate in its production, it does not substantiate that claim or explain why the range of HS subheadings used in Commerce's analysis were not comparable.

Commerce's decisions should be sustained in all respects.

## ARGUMENT

### I. Standard of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). Courts "hold unlawful and set aside agency action, findings, and conclusions found to be {} arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law{.}" 5 U.S.C. § 706(2). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions does not make Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, a party challenging an agency determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal citation and quotation omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions, *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562–63 (Fed. Cir. 1984). Moreover, it is not necessary for Commerce to provide an explicit explanation so long as its decisional path is reasonably discernible. *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998).

With respect to Commerce's exercise of discretion under the countervailing duty statute, the Federal Circuit recently reaffirmed that "when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and capricious standard." *Mosaic Co. v. United States*, 160 F.4th 1340, 1346 (Fed. Cir. 2025) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168, 179–80 (2025)). "Under that standard," the Federal Circuit explained, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Id*.

## II. Commerce's MTAR and LTAR Benchmarks Appropriately Accounted for Record Evidence of the Distorted Chinese Market

The Coalition argues that Commerce's MTAR calculation was flawed in two ways. First, while it does not dispute that the Chinese marketplace for the equipment was distorted, it claims that Commerce was nonetheless required to use quotes from that distorted marketplace as a benchmark price. It further argues that, rather than benchmark the price by kilogram, Commerce should have used a per-unit benchmark. The Coalition is wrong on both counts: Commerce lawfully disregarded the distorted prices from the Chinese marketplace and it reasonably selected the per-kilogram metric as the less flawed of the options available to it.

The Coalition also asserts that, since the Chinese marketplace is generally distorted, Commerce should not have relied on Dingli's inland freight expenses as an input in its LTAR calculation. But Commerce rightly recognized that the record did not support the conclusion that inland freight prices were distorted, so it reasonably relied on Dingli's expenses.

### A. Given the distorted Chinese market, Commerce lawfully selected a world-market benchmark for the equipment

In selecting a benchmark price for equipment in its MTAR analysis, Commerce recognized that the Chinese market for the equipment was distorted and therefore relied on UN

Comtrade data for that purpose. The Coalition argues that Commerce should have nevertheless relied on data from Chinese marketplaces. Coalition MJAR 11–15. Its argument is unpersuasive.

Under 19 U.S.C. § 1677(5)(E)(iv), a foreign producer has been conferred a benefit when its goods are "purchased for more than adequate remuneration" as compared to remuneration "at prevailing market conditions." Commerce measures the adequacy of remuneration by comparing the price paid to "a market-determined price . . . resulting from actual transactions in the country in question" or, if such a price is unavailable, "to a world market price." 19 C.F.R. § 351.511(a)(2).

Here, Commerce determined that a market-determined price for equipment in China was unavailable. Specifically, Commerce noted that GOC's responses to its questionnaires were inconsistent with Dingli's responses and that, when asked to clarify, GOC did not do so. PDM at 14–15. It therefore relied on the facts available and applied an adverse inference under 19 U.S.C. § 1677e(b) to find that transactions in China were "significantly distorted such that they cannot be used" as a benchmark. PDM at 15; *see also* IDM 25. Commerce therefore used the only acceptable data in the record, the UN Comtrade data provided by Dingli. IDM at 25.

Notably, the Coalition does not dispute that the Chinese market is distorted. *See* Coalition MJAR 11–15. It nevertheless contends that Commerce should have used data from the Chinese marketplace—the distorted marketplace—as the equipment price benchmark. *Id.* This position can be squared with neither Commerce's regulations nor common sense.

The Coalition first argues that Commerce failed to "explain" why the market for equipment was "too distorted for benchmarking use." *Id.* 12. To the contrary: Commerce detailed its attempts to acquire sufficient information about the Chinese market for the

equipment; GOC's failure to cooperate, inconsistencies between GOC and Dingli responses; and Commerce's conclusion that prices from transactions in China were "significantly distorted such that they cannot be used" as a benchmark. *See* PDM at 14–15; IDM at 9–10, 25. Since the prices in China were not market-determined, they could not represent "prevailing market conditions." *See* 19 C.F.R. § 351.511(a)(2).

The Coalition next contends Commerce failed to "grapple" with the effect of Chinese procurement rules, which it says "render{s} world prices practically unavailable to Chinese government authorities." Coalition MJAR 15. But Chinese procurement rules do not render the Coalition's preferred benchmark—which are still from the Chinese marketplace—any less distorted. Commerce adequately considered this issue when it rejected the Coalition's proposal to use price quotes from the Chinese marketplace as the benchmark or, alternatively, export data limited to Chinese exports. *See* IDM at 25. The distorted market in China made both unusable, and the price quotes were even less useful because they did not "represent actual transaction prices," and did not even identify the supposed purchaser. *Id.* Insofar as the Coalition contends that Commerce must select a world-market price that is available to Chinese consumers, even if that price is distorted, it is incorrect. *See* Coalition MJAR 11–15. And contrary to the Coalition's suggestion, Commerce adequately explained why it instead relied on data which was not tainted by the distorted Chinese market.

The Coalition also implies that Commerce cited the wrong provision of its own regulations when choosing the benchmark. Coalition MJAR 11. The Coalition is mistaken.

The provision the Coalition cites, 19 C.F.R. § 351.512, became effective on January 15, 2025. *See* 89 Fed. Reg. 101,694, 101,766 (Dep't of Commerce Dec. 16, 2024). Commerce had already initiated this review, *see* 89 Fed. Reg. at 8,647 (initiating this review on February 8,

2024), so the subsequent amendment to the regulations does not apply, *Rhone Poulenc, Inc. v. United States*, 738 Fed. Supp. 541, 543 (Ct. Int'l Trade 1990) (where amendment went into effect during antidumping investigation, regulation at time of initiation applied); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ("congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result"). Commerce therefore properly applied 19 C.F.R. § 351.511 in its MTAR analysis.

In any event, Commerce's logic would have been equally sound under the new regulation. The new provision permits Commerce to "exclude certain prices from a particular country from its analysis" if it "determines that . . . government laws or policies . . . likely impact such prices." 19 C.F.R. § 351.512(a)(2)(iii). As noted above, Commerce did just that when it found that the prices in the Chinese marketplace were distorted and avoided using those prices. The Coalition's argument—that Chinese policies mean that Commerce should *only* consider distorted prices—turns the regulation on its head. *See* Coalition MJAR 14. Indeed, under either provision, when Commerce finds that a "market-determined" price is unavailable, it correctly moves on to select a "world-market" price, and appropriately excludes those prices from countries where "government laws or policies . . . likely impact such prices." *See* 19 C.F.R. §§ 351.511(a)(2)(ii), (a)(2)(v); 351.512(a)(2)(ii), (a)(2)(iii).

In sum, Commerce appropriately selected the UN Comtrade data—the only data not part of the distorted Chinese market—for the price benchmark.

**B. Commerce's weight-based metric for equipment price was supported by substantial evidence**

Commerce expressed the equipment price for its MTAR calculation using a "per-kilogram" metric rather than a "per-unit" metric. Contrary to the Coalition's arguments,

Coalition MJAR 16–19, Commerce was well within its discretion to select a "per-kilogram" benchmark.

Commerce recognized that, ideally, it would use a model-to-model comparison for this purpose, but that the data necessary for that analysis was not in the record. IDM at 24. As a result, it had to choose between two imperfect metrics, making clear that both proposals would elide prices differences due to some models having more functions or a higher quality than others. *Id.* But the per-kilogram metric "at least accounts for price differences attributable to size." *Id.* Commerce was well within its discretion to choose the per-kilogram metric. *Mosaic Co.*, 160 F.4th at 1348.

The Coalition contends that, since the equipment is typically not bought and sold by weight, Commerce's approach "contravenes" both its past practice and its regulation. Coalition MJAR 18. But Commerce's regulation states that Commerce's analysis be based on "actual transactions," not that a particular unit of measurement be used. *Contra id.* (citing 19 C.F.R. § 351.512(a)(2)(i)[8]). And while the Coalition cites several administrative reviews which it says establish a uniform rule requiring Commerce to retain the unit in which most transactions were reported, Coalition MJAR 16–17, 19, those decisions did not establish precedent binding Commerce in this case. Rather, "{e}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016). Here, Commerce expressly recognized the limitations of the data in the record before it and made clear that its preference would have been to perform a model-to-model comparison. IDM at 24.

[8] As noted above, 19 C.F.R. § 351.512 postdated the initiation of this administrative review and therefore did not apply. The same logic applies to both 19 C.F.R. § 351.511 and 19 U.S.C. § 1677, neither of which prescribe a specific unit of measurement.

Since the data necessary to perform a model-to-model comparison was not available, Commerce exercised its own judgment to choose the most reasonable available metric.

The Coalition also accuses Commerce of ignoring distortions introduced by the per-kilogram metric. Coalition MJAR 18. This is incorrect. As noted above, Commerce recognized that both options elided certain differences between equipment models and chose per-kilogram because it had the benefit of accounting for differences in equipment size. IDM at 24. The Coalition asserts that per-kilogram was more distortive than per-unit, but it offers no objective record support for that conclusion. *See* Coalition MJAR 18. To the extent the Coalition might draw a different conclusion from the same evidence, its opinion does not demonstrate that Commerce's decision was not supported by substantial evidence. *See Mosaic Co.*, 160 F.4th at 1346.

In sum, Commerce's judgment call when comparing imperfect alternatives was a methodological judgment reviewed for reasonableness. *Mosaic*, 160 F.4th at 1346; *see, e.g., GPX Int'l Tire Corp. v. United States*, 942 F. Supp. 2d 1343 (Ct. Int'l Trade 2013) (where "various imperfect methods exist{ed} to calculate a benchmark rate," finding Commerce's choice to be "a reasonable attempt at arriving at a difficult determination"). The Coalition's argument that the per-kilogram benchmark was imperfect, even if accepted, does not render Commerce's judgment unreasonable. This Court should sustain Commerce's methodology as a reasonable exercise of its benchmark-selection authority.

### C. Commerce reasonably used Dingli's inland freight expenses

In its LTAR calculation, Commerce used Dingli's actual inland freight costs as an input. IDM at 36. While the Coalition urged use of a tier-two benchmark because Chinese input markets were distorted, Commerce found no evidence in the record that inland freight costs were distorted. *Id.* The Coalition now renews its argument. Coalition MJAR 20–22.

Under 19 C.F.R. § 351.511, Commerce's comparison price includes the price a firm actually paid or would pay, including delivery charges. *Id.* § 351.511(a)(2)(iv). Here, Dingli provided a worksheet reporting shipping weight, freight expenses, and a per-kilogram amount for closely related inputs shipped from Dingli to Shanghai during the period of review. Dingli Initial Questionnaire Response (June 5, 2024) (C.R. 8) (P.R. 32) at 20; *id.* Ex. V.A.3.2 (C.R. 42). While the Coalition disputed whether Commerce would typically use a respondent's own inland freight data, calling Commerce's practice "mixed," Commerce noted that it had a "long-standing practice" of using such data. IDM at 35–36. It further noted that, while it chose to benchmark inland freight prices in a recent decision, that case featured record evidence of distorted inland freight prices not present here. IDM at 36 (citing *LSPTVs from China*, 90 Fed. Reg. 26,536 (June 23, 2025), and accompanying IDM at 85–86). Given the facts in this record, Commerce appropriately relied on Dingli's inland freight expenses.

The Coalition now argues that Commerce's finding that the inland freight costs were not distorted "stands in sharp contrast" to its findings with respect to other aspects of the Chinese markets, including the ocean freight prices that Commerce found were distorted. Coalition MJAR 22. However, Commerce did *not* find that inland freight expenses were distorted, and Coalition does not now argue that Commerce should have done so. *Id.* Rather, it argues merely that Commerce's conclusion regarding ocean freight prices should have caused it to disregard Dingli's inland freight expenses. But a finding that one sector of the Chinese market was distorted does not necessarily equate a finding that all aspects of the country's economy are distorted for purposes of Commerce's CVD benchmark hierarchy. *See, e.g.*, *Yama Ribbons & Bows Co., Ltd. v. United States*, 719 F. Supp. 3d 1388, 1394, 1398–99 (Ct. Int'l Trade 2024)

(describing and sustaining Commerce's determination that certain discrete input markets are distorted and thus not suitable to serve as a tier-one benchmark).

The Coalition also compares this case to *Beijing Tianhai Indus. Co. v. United States*, where the Court remarked that Commerce has a "practice of ordinarily declining to rely upon delivery charge data that is specific to a particular respondent when using a tier-two benchmark{.}" 52 F. Supp. 3d 1351, 1375 (Ct. Int'l Trade 2015). There, however, the Court went on to *affirm* Commerce's use of that data. *Id. Beijing Tianhai* thus reaffirmed that (1) Commerce may validly use a respondent's delivery charge data even when using a tier-two benchmark elsewhere in its analysis and (2) Commerce's discretion in exercising its authority allows it to form different conclusions based on the different facts in the record. *See Jiaxing Bro. Fastener Co.*, 822 F.3d at 1299. Applying those principles here, Commerce evaluated the evidence before it, observed a lack of evidence that inland freight prices were distorted, and reasonably selected Dingli's expenses as the inland freight expense data.

The Coalition also disputes Commerce's observation that it is its "long-standing practice" to use a respondent's actual inland-freight expenses. Coalition MJAR 22. Here, however, Commerce did not rely merely on its prior decisions in opting to use Dingli's expenses. Commerce acknowledged that it had at times elected to benchmark delivery charges based on the facts presented in particular cases, *see* IDM at 36, and its decision to do so here was amply supported by the record before it, *see Jiaxing Bro. Fastener Co.*, 822 F.3d at 1299.

Given the lack of evidence that inland freight expenses were distorted, Commerce reasonably relied on Dingli's expenses. The Court should sustain that decision.

## III. Commerce Selected Comparable HS Subheadings as LTAR Benchmarks

In its less-than-adequate remuneration calculation, Commerce determined that the Chinese markets for certain inputs, including hollow structural shapes and steel sheet and plate,

were distorted. PDM at 22; IDM at 26–28. It therefore selected tier-two benchmarks for each, ultimately selecting a variety of HS subheadings to use to benchmark their prices. IDM 26–28. Dingli now argues that, for hollow structural shapes and steel sheet and plate inputs, Commerce should have used a narrower range of the selected HS subheadings which it claims more closely match the inputs it uses in its own manufacturing. Dingli MJAR 13–25. It is wrong.

Applying the appropriate standard, the HS subheadings Commerce selected for hollow structural shapes and for steel sheet and plate were reasonable.

**A. Comparable prices and the narrowness of benchmarks**

When selecting a tier-two benchmark, "Commerce's regulations require only that it {select} a *comparable* market-determined price that would be available to the purchasers in the country at issue," not that it select an *identical* benchmark. *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273–74 (Fed. Cir. 2012) (emphasis added). And the Court's role "is not to assess whether the benchmark data Commerce used" is "the 'best available,' but rather whether Commerce's choice was reasonable." *Baroque Timber Industries (Zhongshan) Co., Ltd. v. United States*, 837 F. Supp. 3d 1314, 1322–23 (Ct. Int'l Trade 2026).

Dingli repeatedly asserts, incorrectly, that Commerce must select the "narrowest category of products" for its tier-two benchmarks. *See* Dingli MJAR 20. But Commerce is tasked with identifying *comparable* benchmarks, not merely the "narrowest" category available. Dingli asserts that a "mountain" of cases stand for the proposition that Commerce must always select the narrowest categories of products, but a closer inspection of its authorities paints a different picture.

For instance, it invokes *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, which concerned the difference between "plywood" and "laminate wood." 769 F. Supp. 3d 1344, 1371–75 (Ct. Int'l Trade 2025). The Court rejected Commerce's conclusion that "all

plywood is a laminate structure" because the evidence before Commerce "indicate{d} that a single layer of plywood may or may not be laminated," making those products distinct and not comparable. *Id.* at 1371. And since the respondent "submitted uncontroverted data" that it only used plywood, and not laminated wood, the Court held that Commerce should have excluded an HS subheading which included laminated wood. *Id.* at 1374. Notably, the Court's decision relied on *both* that the two products in question were not comparable *and* the uncontroverted fact that the respondent did not use one of those products.

Commerce's decision regarding *Certain Aluminum Foil from China* is similarly instructive. *See* Dingli MJAR 11. There, Commerce initially included prices for both alloyed aluminum ingot and unalloyed aluminum ingot. *Countervailing Duty Investigation of Certain Aluminum Foil From the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Dep't of Commerce Mar. 5, 2018), accompanying IDM at Cmt. 16. However, Commerce revised the benchmark after a respondent pointed out that it reported only using unalloyed ingot and that "the price for alloyed aluminum ingot is $208.90 higher than the price for unalloyed aluminum ingot," which "distorts the benchmark price of this input" and made the two products incomparable. *Id.* Again, it was important both that the products in question were not comparable *and* that respondent did not use one of them.

Other decisions cited in Dingli's brief similarly reflect that Commerce's comparability analysis is fact-intensive and record-dependent. *See* Dingli MJAR 9–18. For instance, in an investigation about wood flooring, Commerce identified "{r}ecord information related to wood types and species" which weighed "in favor" of finding that plywood with "at least one outer ply of tropical wood" was not comparable to other types of plywood. *Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing*

*Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020), accompanying IDM at Cmt. 6. In the same decision, Commerce found that "{i}nformation on the record demonstrate{d}" that "blockboard and battenboards" were "unlike plywood" and thus not comparable. *Id.*

In another, Commerce recognized that two sources of data regarding extruded aluminum were flawed in different ways and decided that, *rather* than use the source encompassing the "narrowest category of products," it instead averaged the data from the two sources. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (Dep't of Commerce July 23, 2018), accompanying IDM at Cmt. 3. Another concerned wire rods meant for use in welding; Commerce rightly refused to include in its benchmark wire rods which were *not* intended for welding. *Certain Steel Racks and Parts Thereof From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 21,177 (Dep't of Commerce Apr. 10, 2023), accompanying IDM at Cmt. 2. Lastly, Dingli cites a decision in which a respondent requested to exclude certain HS subheadings based on the claim that it did not purchase those products. *Wood Mouldings and Millwork Products From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 8,408 (Dep't of Commerce Feb. 23, 2026), accompanying IDM at Cmt. 4. However, the respondent failed to "substantiate" its claim, so Commerce reasonably declined to exclude those HS subheadings. *Id.*

* * *

Surveying Dingli's cited authorities, what emerges is Commerce's practice of performing highly fact-specific and record-dependent comparability analyses. Here, Commerce continued that practice and selected comparable benchmarks whose scopes were amply supported by the record of its investigation.

**B. Hollow structural shapes**

The benchmark that Commerce used to measure the adequacy of remuneration includes fourteen HS subheadings. IDM at 28. Dingli contends that Commerce should have used only the four subheadings which do not refer to circular cross-sections. Dingli MJAR 13–20. The question before the Court is therefore whether Commerce reasonably determined that hollow metal tubes with a square or rectangular cross-section is "comparable" to hollow metal tubes with a circular cross-section. The answer is "yes."

To begin, Dingli does not assert that tubes with circular cross-section are materially different from those with square or rectangular cross-sections. *See* Dingli MJAR 17–19. It does not contend, for example, that equipment may not be manufactured using circular cross-sections or that, as in *Jiangsu Senmao Bamboo & Wood*, the products are materially different. 769 F. Supp. 3d at 1371–75. It instead contends that they are not comparable because they have different HS subheadings.

Instead, Dingli argues that Commerce was obligated to use the "narrowest" range of products available. Dingli MJAR 16–18. But as explained above, this assertion misconstrues the comparability analysis. For example, unlike in *Multilayered Wood Flooring from China*, where there was "{r}ecord information related to" the products in question which weighed "in favor" of distinguishing between plywood and plywood with an outer layer of tropical wood, Dingli does not explain why having a circular cross-section transforms the hollowed structural shape into a new product category. *See* 85 Fed. Reg. at 76,011, accompanying IDM at Cmt. 6.

Unlike in *Certain Aluminum Foil from China*, where respondent explained that alloyed aluminum ingot was substantially more expensive than unalloyed aluminum ingot, Dingli did not show that having a circular cross-section altered the product's price. *See* 83 Fed. Reg. at 9,274, accompanying IDM at Cmt. 16.

Those fact-bound decisions do not support Dingli's position here, where it fails to explain how having a circular cross-section renders hollow structural shapes not comparable to those with square or rectangular cross-sections, and where it fails to show a price difference between the various products. And while it chides Commerce for pointing out that there was no price difference in the record, Dingli MJAR 18–19, Commerce rightly inquired on that point. Dingli also takes issue with Commerce's reference to finding "broad averages that represent the overall global market for the input with comprehensive benchmarks that cover a wide range of products." Dingli MJAR 19–20 (quoting IDM at 26). Dingli's focus on that statement distracts from Commerce's actual application of the comparability standard. As set out above, Commerce rightly found that the HS subheadings encompassed products that were comparable to Dingli's inputs.

Finally, Dingli argues that Commerce failed to follow its past practice, citing a single prior decision in the investigation which excluded HS subheadings for products with circular cross-sections. Dingli MJAR 20. But Dingli ignores that Commerce may change its practice provided it explains its decision. *See SKF USA Inc. v. United States*, 630 F.3d 1365, 1373–75 (Fed. Cir. 2011). Here, Commerce adequately explained that its most recent analysis rested on its conclusion that Dingli had not explained why differences in shape meant that the circular cross-section subheadings were not comparable such that they should be excluded. IDM at 27–28.

Dingli's choice of hollow structural shape benchmark applied the correct standard, was reasonable, and was reasonably explained. That was all that was required.

**C. Steel sheet and plate**

For steel sheet and plate inputs, Commerce selected a world-market benchmark covering 27 HS subheadings. IDM at 26–27. Dingli contends, as it did before Commerce, that certain subheadings are inapplicable because of differences in thickness, processing, coating, and alloy content, and because some of the subheading descriptions did not expressly specify that the steel is "hot-rolled." Dingli MJAR 20–25. Commerce found that Dingli had not supported its claims with record evidence and retained all 27 HS subheadings. Commerce's decision was reasonable.

In addressing Dingli's arguments, Commerce examined Dingli's evidence regarding the type of steel it used and found that its arguments were "not corroborated by the record." IDM at 27. This is despite giving Dingli the opportunity to clarify its own data. Commerce issued Dingli a supplemental questionnaire specifically on this topic, asking it to clarify aspects of Exhibit V.A.3.1.b of its initial questionnaire response regarding its purchases of hot-rolled steel sheet inputs. *See* Dingli HRS Supplemental Questionnaire at 4 (Mar. 28, 2025) (C.R. 161) (P.R. 267). Dingli responded with a revised exhibit, Exhibit SD-1. Dingli HRS Supplemental Questionnaire Response (Mar. 31, 2025) (HRS Response) (C.R. 166–67) (P.R. 269). The exhibit provides invoice dates; supplier names and addresses; producer names and addresses; volume ordered; total value; VAT rates paid; product type; and product descriptions. *See* Dingli Exhibit SD-1 (C.R. 167). Product types include "Hollow Structural Shapes" and "Hot-Rolled Steel Plate." *Id.* Regarding steel plate, the product descriptions include "[ ]," "[ ]," or similar, *id.*, which Commerce remarked were "not clear," IDM at 27. It therefore found Dingli's objection to certain HS subheadings based on product thickness or the "exact kind of metal" used was not supported by the record. *Id.* And while

Dingli had objected to HS subheadings which referred to "cold-rolled" steel, Commerce observed that such products would necessarily be "hot-rolled" before undergoing further treatment. *Id.*

Dingli nevertheless contends that Commerce should have narrowed the selected HS subheadings. First, it notes that an earlier decision in the proceeding had limited the HS subheadings and claims that Commerce was bound by that earlier decision. As with the hollow structural shape inputs, however, Commerce was not bound by that prior decision and was free to change its approach provided it explained its decision as set out above. *See SKF USA Inc.*, 630 F.3d at 1373–75.

Dingli next takes issue with Commerce's observation that the question was "not what Dingli exactly purchased" but "what a hypothetical respondent would pay" for comparable inputs. Dingli MJAR 21–22 (citing IDM at 28). Rather than concern itself with "availability," Dingli says, Commerce's first step should have been to evaluate the "quality (i.e., specificity)" of the benchmark. *Id.* As set out above, however, that is exactly what Commerce did. And when it evaluated Dingli's evidence for specificity, it found that evidence lacking.

Third, Dingli emphasizes the qualities of cold-rolled steel, citing a Customs classification decision which found that, for country-of-origin purposes, cold-rolling steel substantially transformed hot-rolled stainless steel. Dingli MJAR 23 (citing NY H84171 (U.S. Customs Service Aug. 10, 2001) and Headquarters Ruling 089538 (U.S. Customs Service Aug. 7, 1991)). But those decisions apply a different standard. Moreover, when performing its own statutory mandate, Commerce is not bound by Customs' decisions. *SolarWorld Ams. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018). Here, Commerce was tasked with identifying comparable inputs for the LTAR calculation. While Dingli insists that "{t}hese are clearly different products

with different uses," Dingli MJAR 23, Dingli does not deny that the various types of steel captured in Commerce's HS subheadings could be used in the manufacture of the equipment under investigation. And again, as Commerce found, Dingli's own exhibit addressing this question was vague, so Dingli has not substantiated the claim that it does not use these types of steel.

Lastly, Dingli states that there is "no evidence on the record that Dingli purchases" steel with a cladding or coating of different metals and that HS subheadings meeting that description should have been excluded. Dingli MJAR 24. Dingli again misstates the applicable standard. Commerce evaluated Dingli's claim and its submissions and found that the evidence in the record did not support narrowing the HS subheadings to exclude those products. IDM at 26–27. As noted above, Dingli's exhibits did not exclude those subheadings or otherwise show that they were not comparable.

Commerce provided a reasoned, record-based explanation for its steel benchmark selections. Dingli's assertion that it used a narrower range of products is not supported by the record, and neither does it show that the range of HS subheadings used by Commerce are not comparable to its own inputs.

## CONCLUSION

For these reasons, the defendant respectfully requests that the Court deny plaintiffs' motions and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

Of Counsel:

BRIEN STONEBREAKER
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
U.S. Department of Commerce
Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

TARA K. HOGAN
Assistant Director

s/ Oliver J. McDonald
OLIVER J. MCDONALD
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 305-0168
Oliver.J.McDonald@usdoj.gov

October 8, 2026

*Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limitation set forth in the Court's September 17, 2026, amended scheduling order and contains 7,497 words, excluding parts of the brief that the Court exempts from such word limitations. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

s/ Oliver J. McDonald
OLIVER J. MCDONALD