**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,**<br>**Plaintiff,**<br><br>**ZHEJIANG DINGLI MACHINERY CO., LTD.,**<br>**Consolidated Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br>**Defendant,**<br><br>**and**<br><br>**ZHEJIANG DINGLI MACHINERY CO., LTD.,**<br>**Defendant-Intervenor.**<br><br>**COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,**<br>**Defendant-Intervenor.** | **Before: Hon. Claire R. Kelly, Judge**<br><br>**Consol. Court No. 26-00702** |

**DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

**Timothy C. Brightbill, Esq.**
**Laura El-Sabaawi, Esq.**
**Enbar Toledano, Esq.**
**Theodore P. Brackemyre, Esq.**

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

***Counsel to the Coalition of American Manufacturers of Mobile Access Equipment***

**Dated: November 19, 2026**

**Ct. No. 26-00702**

## TABLE OF CONTENTS


**Page**

I. INTRODUCTION ..... 1
II. STATEMENT PURSUANT TO RULE 56.2 ..... 1
  A. Administrative Determination Under Review ..... 1
  B. Issues Presented for Review ..... 1
III. STATEMENT OF THE FACTS ..... 2
IV. STANDARD OF REVIEW ..... 6
V. ARGUMENT ..... 7
  A. Commerce's Benchmark Selections Were Lawful and Consistent with Past Agency Practice ..... 9
  B. Commerce's Benchmark Selections Were Supported by Substantial Evidence ..... 15
    1. Hollow Structural Shapes ..... 15
    2. Hot-Rolled Steel Sheet and Plate ..... 19
V. CONCLUSION ..... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Archer Daniels Midland Co. v. United States*,
779 F. Supp. 3d 1349 (Ct. Int'l Trade 2025) ....................9, 10

*Baroque Timber Industries (Zhongshan) Co., Ltd. v. United States*,
837 F. Supp. 3d 1314 (Ct. Int'l. Trade 2026) ....................7, 9, 18

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012) ....................7, 9

*Guizhou Tyre Co. v. United States*,
348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ....................19

*Hindalco Indus. Ltd. v. United States*,
794 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) ....................19

*Hyundai Heavy Indus., Co. v. United States*,
332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018) ....................6, 18

*Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States*,
769 F. Supp. 3d 1344 (Ct. Int'l Trade 2025) ....................12

*Jiangsu Zhongji Lamination Materials Co. v. United States*,
745 F. Supp. 3d 1305 (Ct. Int'l Trade 2024) ....................11

*Jinan Yipin Corp. v. United States*,
35 C.I.T. 1254, 800 F. Supp. 2d 1226 (2011) ....................7, 17

*RZBC Grp. Shareholding Co. v. United States*,
No. 15-00022, 2016 WL 3880773 (Ct. Int'l Trade 2016) ....................8, 9

*Shandong Huarong Machinery Co., LTD. v. United States*,
30 C.I.T. 1269, 435 F. Supp. 3d 1261 (2006) ....................18

*Shandong Jinxiang Zhengyang Imp. & Exp. Co. v. United States*,
429 F. Supp. 3d 1373 (Ct. Int'l Trade 2020) ....................6, 17

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
298 F.3d 1330 (Fed. Cir. 2002) ....................6

*Yantai CMC Bearing Co. v. United States*,
203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017) ....................6

**Regulations**

19 C.F.R. § 351.301(c)(3)(iv) ....................19, 20

**Administrative Materials**

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*,
90 Fed. Reg. 59,492 (Dep't Commerce Dec. 19, 2025) ....................1, 5

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*,
86 Fed. Reg. 57,809 (Dep't Commerce Oct. 19, 2021) ....................18

*Certain Steel Racks and Parts Thereof From the People's Republic of China*,
88 Fed. Reg. 21,177 (Dep't of Commerce Apr. 10, 2023) ....................14

*Certain Uncoated Paper from the People's Republic of China*,
81 Fed. Reg. 3,110 (Dep't Commerce Jan. 2, 2016) ....................11

*Countervailing Duty Investigation of Certain Aluminum Foil From the People's Republic of China*,
83 Fed. Reg. 9,274 (Dep't of Commerce Mar. 5, 2018) ....................10

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China,*
83 Fed. Reg. 9,274 (Dep't Commerce Mar. 5, 2018) ....................13

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
89 Fed. Reg. 8,641, 8,647 (Dep't of Commerce Feb. 8, 2024) ....................2

*Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*,
90 Fed. Reg. 15,443 (Dep't of Commerce April 11, 2025) ....................3

*Multilayered Wood Flooring from the People's Republic of China*,
85 Fed. Reg. 76,011 (Dep't Commerce Nov. 27, 2020)....................................13

*Wood Mouldings and Millwork Products From the People's Republic of China*,
91 Fed. Reg. 8,408 (Dep't Commerce Feb. 25, 2026) ................................10, 12

## I. INTRODUCTION

Pursuant to USCIT Rule 56.2, Defendant-Intervenor the Coalition of American Manufacturers of Mobile Access Equipment ("Coalition") respectfully submits the following brief in opposition to Plaintiff Zhejiang Dingli Machinery Co., Ltd.'s ("Dingli") motion for judgment on the agency record in the above-captioned action. Pl.'s Mot. for J. on the Agency R. (June 26, 2026), ECF No. 27 ("Dingli Br.").

## II. STATEMENT PURSUANT TO RULE 56.2

### A. Administrative Determination Under Review

The administrative determination under review is the U.S. Department of Commerce's ("Commerce") final determination in the administrative review covering the period January 1, 2022, through December 31, 2022, of the countervailing duty order on *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*. The final results were issued on December 15, 2025, and published in the *Federal Register* on December 19, 2025. *See Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 90 Fed. Reg. 59,492 (Dep't Commerce Dec. 19, 2025) (final results of countervailing duty admin. rev.; 2022), P.R. 318 ("Final Results") and accompanying Issues and Decision Memorandum, P.R. 315 ("IDM").

### B. Issues Presented for Review

1. Was Commerce's selection of the tier-two benchmark for hollow structural shapes supported by substantial evidence and in accordance with law?

2. Was Commerce's selection of the tier-two benchmark for hot-rolled steel plate supported by substantial evidence and in accordance with law?

## III. STATEMENT OF THE FACTS

For purposes of Dingli's appeal, the Coalition joins in the Statement of Facts provided in the United States' opposition brief, *see* Def.'s Resp. to Pls.' Mot. for J. on the Admin. R. (Oct. 8, 2026), ECF Nos. 30–31 at 3–8 ("DOJ Br."), and separately highlights the following timeline as relevant to this appeal. As demonstrated below, Dingli had ample opportunity—but failed—to place factual information on the record to support its belated arguments challenging Commerce's selection of the less-than-adequate-remuneration ("LTAR") benchmarks for hollow structural shapes and hot-rolled steel sheet and plate.

Commerce initiated the underlying administrative review on February 8, 2024, and selected Dingli as a mandatory respondent for individual examination on April 9, 2024. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 8,641, 8,647 (Dep't of Commerce Feb. 8, 2024), P.R. 8; *Respondent Selection Memorandum* (Apr. 9, 2024), C.R. 4, P.R. 16. Dingli and the Coalition each submitted benchmark information on December 6, 2024, including proposed benchmark prices for hollow structural shapes and hot-rolled steel sheet and plate. *See* Dingli Benchmark Submission (Dec. 6, 2024), C.R. 90–93, P.R. 98–100; Petitioner's Benchmark Submission (Dec. 6, 2024), C.R. 94–109, P.R.101–109. The Coalition's proposed benchmark data for each of those inputs was broader (*i.e.*, included more HTS subheadings) than Dingli's, reflecting the nature of the inputs being examined for each LTAR program. Dingli did not submit a rebuttal benchmark submission in response to the Coalition's December 6, 2024 benchmark filing.

Dingli submitted additional benchmark information on March 6, 2025, rebuttal benchmark information on March 17, 2025, and supplemental questionnaire responses concerning its steel purchases on March 31, 2025 (to address discrepancies in Dingli's reporting identified by

Commerce). *See* Dingli Benchmark Submission (Mar. 6, 2025)[1], C.R. 122–152, P.R. 147–149; Dingli Rebuttal Benchmark Submission (Mar. 17, 2025), P.R. 248–249; Dingli HRS Supplemental Questionnaire Response (Mar. 31, 2025), C.R. 166–167, P.R. 269 ("HRS Response"). Not one of those submissions addressed the benchmark for hollow structural shapes or hot-rolled steel, much less provided evidence or argument undermining the Coalition's benchmark submission.

Commerce published its preliminary results on April 11, 2025, making preliminary decisions about which benchmarks to use for certain inputs in its LTAR calculation. *See Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 90 Fed. Reg. 15,443 (Dep't of Commerce April 11, 2025) (prelim. results and rescission, in part, of the countervailing duty admin. re.; 2022), P.R. 278; *see also* accompanying Preliminary Decision Memorandum, P.R. 273 ("PDM"); Preliminary Calculation Memorandum (Apr. 7, 2025), C.R. 168–171, P.R. 274–276. With regard to the inputs for hollow structural shapes and hot-rolled steel sheet and plate, Commerce preliminarily selected the Coalition's benchmarks:

> The petitioner and Dingli both provided UN Comtrade data for these inputs. However, all HS subheadings Dingli uses for hot rolled steel sheet and plate, hollow structural shapes, cold-rolled steel, and lead acid batteries are all already included in the petitioner's benchmarks. As a result, given both databases are from the same source and the petitioner's data include a wider array of HS subheadings that we find appropriate and representative for each of these inputs, we are relying on the petitioner's UN Comtrade data as a benchmark.

PDM at 24 (footnotes omitted).

After the factual record had closed, and Commerce had issued its preliminary results, Dingli twice raised new arguments and submitted new benchmark-related factual information. *First*, on April 17, 2025, the parties responded to a request from Commerce regarding a benchmark

---

[1] As evidenced by the file-stamp, the printed date on Dingli's benchmark submission of "March 6, 2024," rather than 2025, was apparently a typographical error.

that Commerce had placed on the record itself, lacking relevant information from Dingli. *See* Coalition Rebuttal Information on Global Trade Atlas Benchmark Data (Apr. 17, 2025), P.R. 279, 284; Dingli Rebuttal Factual Information (Apr. 17, 2025), C.R. 172–178, P.R. 280–283. In response to Dingli's submission, the Coalition explained that Dingli had failed to submit any benchmark information while the factual record had been open, and attempted belatedly to fill that gap and "shoehorn data onto the record far past the deadline to do so." *See* Coalition Request to Reject Dingli's April 17, 2025 RFI Submission (Apr. 28, 2025), C.R. 180, P.R. 288 at 3. *Second*, on May 9, 2025, the parties submitted case briefs. *See* Coalition Case Br. (May 9, 2025), C.R. 184, P.R. 300; Dingli Case Br. (May 9, 2025), C.R. 181–183, P.R. 296–297. In its brief, Dingli argued—for the first time—that the hollow structural shapes and hot-rolled steel sheet and plate benchmark data the Coalition had placed on the record in December 2024, and that Commerce had preliminarily selected in April 2025, should be narrowed down. *See* Dingli Case Br. at 31–32 (hot-rolled steel), 33–34 (hollow structural shapes). The Coalition noted again that the time to provide record evidence to substantiate those arguments was long past. *See* Coalition Rebuttal Br. (May 22, 2025), C.R. 186, P.R. 306.

In particular, with regard to hot-rolled steel sheet and plate, Dingli argued that Commerce should "remove any HTS provisions that do not match hot-rolled steel plate and the thickness reported" by Dingli. Dingli Case Br. at 32. But Dingli failed to identify the thicknesses of its own plate or compare them to the HTS subheadings Commerce had selected to distinguish them. *See id.*; *see also* Coalition Rebuttal Br. at 2 ("{B}ased on the minimal information provided by Dingli, the exact thicknesses and other specifications of Dingli's purchases are not clear, nor does Dingli make the necessary comparison to its own purchases."). Dingli likewise summarily argued that subheadings for cold-rolled steel should be removed because Dingli reportedly purchased only

hot-rolled steel sheet and plate. *See* Dingli Case Br. at 32. But Dingli had placed no factual information on the record, and thus pointed to none, either confirming its purchases had been so limited or demonstrating that the disputed subheadings were in fact incomparable. *See id.*; *see also* HRS Response at Exhibit SD-1. Indeed, in its rebuttal brief, the Coalition asked Commerce to reject and decline to consider the new factual information submitted by Dingli in its case brief, where Dingli sought to factually characterize the types of steel it purchases. Coalition Rebuttal Br. at 21–22.

With regard to hollow structural shapes, Dingli argued for the first time that eleven of Commerce's fourteen HTS subheadings should be removed, because they related to tubes with circular cross-sections whereas Dingli had described its own purchases as square or rectangular in shape. *See* Dingli Case Br. at 33–34. Again, Dingli pointed to no corroborating evidence regarding the shape of its purchases, nor did it explain how or why hollow structural shapes with circular cross-sections were incomparable to rectangles or squares. *See id.* at 33–34. In response, the Coalition noted that "Dingli had multiple opportunities to raise this line of argument earlier, which would have allowed other parties and the Department to develop the factual record and assess whether these HTS categories are representative of Dingli's HSS purchases. Dingli chose not to do that, though, making this argument for the first time months after the factual record had closed." Coalition Rebuttal Br. at 3.

Commerce issued the Final Results on December 16, 2025, which were published on December 19, 2025, and declined to revise its LTAR benchmarks for either hollow structural shapes or hot-rolled steel sheet and plate. *See* Final Results, 90 Fed. Reg. at 59,492; IDM at Cmts. 7–8. On both fronts, Commerce reiterated that LTAR benchmark prices must be "comparable" but not necessarily "identical" to the respondent's purchases. *See* IDM at 26, 28. And it found

that Dingli had provided "no information" to support its comparability arguments. *See id.* at 27–28 ("{M}any of the details Dingli relies on to differentiate its purchases from HS subheadings used in the benchmark are not corroborated by the record."); *id.* at 28 ("While Dingli does point out that benchmark includes shapes that are not exactly the same as the ones it purchases, there is no information to that effect on the record, nor does Dingli even articulate how HSS with a circular cross section is not comparably priced to HSS with square, rectangular, or other cross sections or otherwise not comparable to those products."). This appeal by Dingli followed.

## IV. STANDARD OF REVIEW

For purposes of Dingli's appeal, the Coalition joins in the Standard of Review provided in the United States' opposition brief, *see* DOJ Br. at 10–11, with the addition of the following relevant legal standards.

"Commerce's role in an administrative proceeding is to weigh the evidence established in the record." *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1324 (Ct. Int'l Trade 2017). "The burden to build the record in each segment lies with the respondent." *Hyundai Heavy Indus., Co. v. United States*, 332 F. Supp. 3d 1331, 1342 (Ct. Int'l Trade 2018) (citing *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002)). Accordingly, a respondent "may not . . . rely on Commerce's factual conclusions from prior reviews in the instant review because each review is separate and based on the record developed before the agency in the review." *Yantai CMC Bearing*, 332 F. Supp 3d at 1342. Nor may a respondent build the record anew in a case brief submission after the evidentiary record has closed: "Filing an administrative case brief affords interested parties an opportunity to present relevant arguments but is not an opportunity to correct factual information for Commerce's renewed consideration." *Shandong Jinxiang Zhengyang Imp. & Exp. Co. v. United States*, 429 F. Supp. 3d 1373, 1379 (Ct. Int'l Trade

2020); *see also Jinan Yipin Corp. v. United States*, 35 C.I.T. 1254, 1292, 800 F. Supp. 2d 1226, 1260 (2011) ("{T}o the extent that the Chinese Producers here harbor any real doubts about the sizes of 'A'-and 'S.A.'-grade garlic . . . , the Chinese Producers were obligated to raise their questions in a timely fashion in the course of the remand, to afford Commerce and the Domestic Producers a proper opportunity to address them before the evidentiary record closed.").

## V. ARGUMENT

In this appeal, Dingli asserts that Commerce's refusal to remove certain HTS provisions from the tier-two benchmarks for hollow structural shapes and hot-rolled steel, as Dingli requested in its case brief, was "contrary to past practice, unsupported by substantial evidence, and otherwise contrary to law." Dingli Br. at 7 (cleaned up). Dingli's assertions are incorrect.

*First*, Commerce's determinations were consistent with both past agency practice and governing law. Dingli argues "Commerce has an indisputable practice of excluding HTS provisions from the benchmark where those HTS provisions are narrowly limited to inputs that the respondent did not purchase." *Id.* at 16. That argument both misstates Commerce's practice—which is to select comparable, but not necessarily identical benchmarks, *see* DOJ Br. at 19 (citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273–74 (Fed. Cir. 2012))—and overlooks the respondent's burden in facilitating such comparisons. In every relevant precedent Dingli cites for this proposition, the respondent affirmatively demonstrated with supporting, timely submitted factual information the incomparability of contested benchmark information. Further, to the extent Commerce once selected the HTS provisions Dingli prefers, in the original investigation, that is not an established practice for purposes of arbitrary-and-capricious review. *See* Dingli Br. at 2, 15, 20, 22; *but see Baroque Timber Industries (Zhongshan) Co., Ltd. v. United States*, 837 F. Supp. 3d 1314, 1326 (Ct. Int'l. Trade 2026) ("Baroque has not cited any evidence demonstrating the

existence of an established procedure or methodology. Baroque cites only to Commerce's use of ITTO TTMR Brazilian domestic price data in the 2020 MLWF review."). Accordingly, Commerce's determinations that Dingli did not demonstrate, in this review, that the benchmark selections for hollow structural shapes and hot-rolled steel were incomparable to its own purchases were wholly in accordance with law and agency precedents.

*Second*, Dingli is wrong to argue that Commerce's selections were unsupported by substantial evidence: Dingli provided none to detract from Commerce's determinations. Dingli asserted for the first time in its case briefs that certain HTS subheadings were incomparable to its purchases and thus should be excluded from Commerce's calculations. But the IDM correctly observed that Dingli had not provided supporting evidence either to (1) confirm that Dingli's purchases were so limited, or (2) render the disputed HTS subheadings incomparable in any material way. *See* IDM at 27–28 (" . . . the exact thicknesses or exact kind of metal of Dingli's purchases are not clear in their response") (" . . . any flat-rolled steel sheet or plate product is going to be hot-rolled, regardless of whether it subsequently undergoes cold-rolling or additional cladding, plating, or coating") (" . . . nor does Dingli even articulate how HSS with a circular cross section is not comparably priced to HSS with square, rectangular, or other cross sections or otherwise not comparable to those products"). Accordingly, Commerce's benchmark selections were supported by substantial record evidence and Dingli points to none detracting from Commerce's determinations. *See, e.g.*, *RZBC Grp. Shareholding Co. v. United States*, No. 15-00022, 2016 WL 3880773, at *10 (Ct. Int'l Trade 2016) (rejecting incomparability argument: "RZBC has not shown variations in pricing or divisions within the steam coal, sulfuric acid, and limestone flux markets that would compel Commerce to deviate from the HTS data" (cleaned up)).

### A. Commerce's Benchmark Selections Were Lawful and Consistent with Past Agency Practice

As the United States notes in its opposition brief, DOJ Br. at 19–20, when selecting a tier-two LTAR benchmark, "Commerce's regulations require only that it {be} a comparable market-determined price that would be available to the purchasers in the country at issue," not that the input be "identical" to a respondent's purchases, *Essar Steel*, 678 F.3d at 1273–74; *accord RZBC Grp. Shareholding*, 2016 WL 3880773 at *10 ("{A} price can ultimately serve as a benchmark source so long as it is a comparable market-determined price—the priced input need not be identical in order for Commerce to use it." (quotation omitted)). In reviewing Commerce's benchmark selections, "the Court's role 'is not to assess whether the benchmark data Commerce used' is 'the "best available," but rather whether Commerce's choice was reasonable.'" DOJ Br. at 19 (quoting *Baroque Timber Industries*, 837 F. Supp. 3d at 1322–23.

A benchmark source may be incomparable if it significantly differs from a respondent's purchases of an input product (*e.g.*, in composition or production process) in a way that meaningfully impacts price. The distinction must be supported by record evidence. For example, in *Archer Daniels Midland Co. v. United States*, the Court reversed and remanded a benchmark selection that accounted for a small percentage of total global exports of phosphate rock where Commerce "chose to exclude any data for sedimentary phosphate rock" without a sufficient evidentiary basis. *Archer Daniels Midland Co. v. United States*, 779 F. Supp. 3d 1349, 1360 (Ct. Int'l Trade 2025). The Court observed that, while Commerce had "reasonably found that the record indicated that sedimentary and igneous rock have different production processes," it "failed to point to any record evidence to suggest that the phosphate rock market is driven by the difference between sedimentary and igneous rock"—or "even that there are different costs associated with the production of each type of rock." *Id.* "Without record evidence {1} that the costs to produce

the two kinds of rock differ significantly and {2} that the distinction between the two was a significant driver of prices in the phosphate rock market, a benchmark reflecting such minimal volume data is unreasonable." *Id.*

Dingli's authorities underscore the point, as the United States' brief correctly observes. *See* DOJ Br. at 19–22. Dingli argues that, "in proceedings involving multiple HTS provisions," Commerce "has consistently followed th{e} court approved practice" of selecting the "narrowest category of products encompassing the input product." Dingli Br. at 10–11 (quotation omitted). But across its cited authorities, Dingli overlooks the respondent's burden to demonstrate, with competent evidence, both its own purchases of the input product and the incomparability of products it did not buy. In *Certain Aluminum Foil From China*, for example, Commerce revised its benchmark to exclude unalloyed aluminum ingot where the respondent (1) provided purchase contracts, "satisf{ying} Commerce verifiers that Dingsheng's purchases were limited to unalloyed aluminum ingots," and (2) "the price for alloyed aluminum ingot {wa}s $208.90 higher than the price for unalloyed aluminum ingot." *Countervailing Duty Investigation of Certain Aluminum Foil From the People's Republic of China*, 83 Fed. Reg. 9,274 (Dep't of Commerce Mar. 5, 2018) (final affirm. deters.) and accompanying Issues and Decision Memorandum at Cmt. 16 (cited in Dingli Br. at 11, 17). Conversely, in *Wood Mouldings from China*, where a respondent "did not provide the HS codes of the paint purchased to confirm the specific input, nor any purchase invoices that substantiate the specific type of paint provided," Commerce declined to limit the input benchmark as the respondent requested. *Wood Mouldings and Millwork Products From the People's Republic of China*, 91 Fed. Reg. 8,408 (Dep't Commerce Feb. 25, 2026) (final results of countervailing duty admin. rev.; 2023) and accompanying Issues and Decision Memorandum at Cmt. 4 (cited in Dingli Br. at 10–11) (emphasis added).

The table below[2] describes (i) the propositions for which Dingli cites purportedly supporting authorities and (ii) omitted context from each authority confirming the inaptness of those propositions here:

<table>
<tr><td colspan="2">Certain Uncoated Paper from the People's Republic of China, 81 Fed. Reg. 3,110 (Dep't Commerce Jan. 2, 2016) (final affirm. countervailing duty deter.) and accompanying Issues and Decision Memorandum at 3 ("Certain Uncoated Paper IDM")</td></tr>
<tr><td>PROPOSITION CITED</td><td>"As noted above, our approach in this regard is consistent with the Department's practice of deriving benchmark prices by grade when such data are available and <u>when the record evidence indicates</u> that the respondent firm purchases the good in question on a grade-specific basis." Dingli Br. at 9–10.</td></tr>
<tr><td>OMITTED CONTEXT</td><td>Consistent with the underlined proviso, where a respondent did not supply record evidence demonstrating the incomparability of an input, Commerce rejected the respondent's proffered benchmark source:<br><br>"{T}he Asia Symbol Companies <u>did not provide information on the record</u> that it does not incur this fee. Therefore, we have utilized only Petitioners' ocean freight data." Certain Uncoated Paper IDM at 26.</td></tr>
<tr><td colspan="2">Jiangsu Zhongji Lamination Materials Co. v. United States, 745 F. Supp. 3d 1305, 1313 (Ct. Int'l Trade 2024)</td></tr>
<tr><td>PROPOSITION CITED</td><td>"(affirming the Department's practice to use the narrowest HTS category that is 'most detailed tariff schedule classification covering these products at the internationally harmonized (six-digit) level of specification')." Dingli Br. at 10.</td></tr>
<tr><td>OMITTED CONTEXT</td><td>The Court affirmed Commerce's benchmark selection where record evidence confirmed the respondents' purchase specifications and supported Commerce's selection:<br><br>"Commerce complied with the Court's remand instructions when Commerce cited to <u>exhibits NSAS-1 and NSAS-2</u> and <u>listed the different specifications of the aluminum sheet products</u> that the Zhongji Respondents purchased." Jiangsu Zhongji, 745 F. Supp. 3d at 1313.</td></tr>
</table>

[2] All emphasis in this table has been added and, unless otherwise noted, internal quotations, citations, footnotes, and alterations have been omitted for legibility.

| ***Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States*, 769 F. Supp. 3d 1344, 1373–74 (Ct. Int'l Trade 2025)** | |
|---|---|
| PROPOSITION CITED | "In applying § 1677(5)(E)(iv) and § 351.511(a)(2)(ii), Commerce has a practice of relying on data reflecting the narrowest category of products encompassing the input product .... To that end, where there are sufficient benchmark data on the record and there is sufficient evidence to support the respondent's claim that it does not purchase a certain product, Commerce will not include data for that product in the benchmark calculation." Dingli Br. at 10. |
| OMITTED CONTEXT | Consistent with the underlined provisos, where (1) "the distinction between plywood and laminated wood" was confirmed by the record and (2) a respondent supplied "uncontroverted data" that it did not purchase laminated wood, the Court found a benchmark selection that included laminated wood unsupported by substantial evidence:<br><br>"{T}he report considered in its entirety supports Baroque Timber's position that plywood and laminated wood are in fact distinct products." *Jiangsu Senmao*, 769 F. Supp. 3d at 1371–72 (noting differences, *e.g.*, in "performance standards").<br><br>"Baroque Timber submitted uncontroverted data in the record that it did not use products covered by HS 4412.99. In addition, the record contains sufficient benchmark data from other HS categories that cover specifically plywood. For those reasons, Commerce's decision to include HS 4412.99 in the plywood for LTAR benchmark calculation is unsupported by substantial evidence." *Id.* at 1374. |
| ***Wood Mouldings and Millwork Products From the People's Republic of China*, 91 Fed. Reg. 8,408 (Dep't Commerce Feb. 23, 2026) (final results of countervailing duty admin. rev.; 2023) and accompanying Issues and Decision Memorandum at Cmt. 4 ("*Wood Mouldings* IDM")** | |
| PROPOSITION CITED | "{W}hen the record demonstrates that a respondent's input purchases are for a specific material, Commerce will use a benchmark that is specific to the purchased input." Dingli Br. at 10–11. |
| OMITTED CONTEXT | Consistent with the underlined proviso, because a respondent did not supply record evidence demonstrating the incomparability of an input, Commerce rejected the respondent's proffered benchmark source:<br><br>"Mangrove did not provide the HS codes of the paint purchased to confirm the specific input, nor any purchase invoices that substantiate |

| | |
|---|---|
| | the specific type of paint provided. Therefore, we have no record evidence to determine the specific type of paint purchased by Mangrove to limit products that may have similar characteristics in our benchmark. Accordingly, the record does not support that the input benchmark should be limited to solely water-based paints and thus we conclude that the HS subheadings (3208.10, 3208.20, and 3208.90), used in the preliminary benchmark calculation, are appropriate for Mangrove's reported purchases." *Wood Mouldings* IDM at cmt. 4. |
| ***Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China*, 83 Fed. Reg. 9,274 (Dep't Commerce Mar. 5, 2018) (final affirm. deter.) and accompanying Issues and Decision Memorandum at Cmt. 16 ("*Aluminum Foil* IDM")** | |
| PROPOSITION CITED | "{I}n selecting the tier 2 benchmark for primary aluminum, Commerce in the preliminary determination used the HTS provision for alloyed aluminum ingot and the separate HTS provision for unalloyed aluminum ingot together. However, in the Final Results, Commerce changed its benchmark, removing the alloyed HTS provision, because the respondent only purchased unalloyed ingot." Dingli Br. at 11. |
| OMITTED CONTEXT | Where a respondent proved with competent, verified evidence that it did not purchase the disputed product, and the disputed product was very differently priced, Commerce removed corresponding HTS provisions from its benchmark selection.<br><br>"On average, the price for alloyed aluminum ingot is $208.90 higher than the price for unalloyed aluminum ingot." *Aluminum Foil* IDM at Cmt. 16.<br><br>"{I}n order to verify Dingsheng's reported purchases of unalloyed aluminum ingots, we reviewed the purchase contracts. . . . Review of these contracts satisfied Commerce verifiers that Dingsheng's purchases were limited to unalloyed aluminum ingots." *Id.* |
| ***Multilayered Wood Flooring from the People's Republic of China*, 85 Fed. Reg. 76,011 (Dep't Commerce Nov. 27, 2020) (final results and partial rescission of 2017 countervailing duty admin. rev.*)* and accompanying Issues and Decision Memorandum at Cmt. 6 ("*Multilayered Wood Flooring* IDM")** | |
| PROPOSITION CITED | "Commerce was faced with numerous HTS provisions to value plywood. In removing certain HTS provisions from the benchmark, Commerce first underscored its practice to rely on data reflecting the narrowest category of products encompassing the input product. Commerce then explained: |

| | |
|---|---|
| | We further agree with Baroque Timber that we should not include HS 4412.31 Plywood . . . in its plywood benchmark. Baroque Timber argues that Commerce should exclude this HS code as it does not purchase plywood with tropical plies and provided sample documentation supporting its claim. While we generally agree with the petitioner that perfection is not required when selecting benchmark information, as noted above, Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product."<br><br>Dingli Br. at 11–12. |
| OMITTED CONTEXT | Consistent with the underlined proviso, where record data confirmed respondents did not purchase a disputed product, Commerce removed the product from its benchmark selection. But where the record lacked such evidence, Commerce declined to amend its benchmark source.<br><br>"{B}ecause . . . there is sufficient evidence supporting Baroque Timber's claim that it does not purchase plywood with tropical plies, we have not included HS 4412.31 in the plywood benchmark calculation for Baroque Timber. However, the record with regard to Jiangsu Guyu's plywood purchases does not support differentiating HS 4412.31 in the same manner and, thus, we have continued to include it in the plywood benchmark calculation for Jiangsu Guyu." *Multilayered Wood Flooring* IDM at Cmt. 6. |
| ***Certain Steel Racks and Parts Thereof From the People's Republic of China*, 88 Fed. Reg. 21,177 (Dep't of Commerce Apr. 10, 2023) (final results and partial rescission of countervailing duty admin. rev.; 2020) and accompanying Issues and Decisions Memorandum at Cmt. 2 ("*Certain Steel Racks* IDM")** | |
| PROPOSITION CITED | "Commerce was faced with multiple benchmark options for steel welding wire and steel welding rod. These included UNComtrade data . . . as well MEPS data for wire rod. In using the UNComtrade data and rejecting the MEPs {sic} data, Commence explained that 'the U.N. Comtrade data are more representative of the steel welding wire and steel welding rod than the MEPS data, because they are limited to materials used for welding applications' and that in contrast 'the MEPS data cover broad categories of wire rod and, therefore may include steel inputs that are not used for welding applications.'" Dingli Br. at 12. |
| OMITTED CONTEXT | As a threshold finding, Commerce rejected the MEPS data as unusable for reasons unrelated to its product mix. |

| | |
|---|---|
| | "Record evidence shows that the MEPS data used to derive the average monthly benchmark prices in the Preliminary Results reflect inconsistent delivery terms and, therefore, are reported on an inconsistent basis." *Certain Steel Racks* IDM at Cmt. 2.<br><br>"Additionally, because the underlying data used to derive the monthly benchmark prices are not on the record, Commerce cannot adjust these data to calculate prices that reflect consistent delivery terms. Such information and/or data regarding the sale and delivery terms is necessary to ensure that the benchmark is reliable and Commerce is able to consistently and accurately adjust the benchmark values." *Id.*<br><br>"Therefore, while Commerce generally prefers monthly data to annual data, as noted above, the deficiencies identified in the MEPS data render this source unusable for the purposes of benchmarking with respect to these two inputs. Accordingly, for the final results, we have determined not to include MEPS data in the benchmark for steel welding wire and steel welding rod." *Id.* |

As the foregoing illustrates, Commerce acted both lawfully and entirely in accordance with agency practice in requiring evidence of incomparability before rejecting an otherwise probative benchmark source. Because Dingli failed to provide any such evidence, as discussed below, Dingli's incomparability arguments on appeal are meritless.

### B. Commerce's Benchmark Selections Were Supported by Substantial Evidence

Applying the appropriate legal standard, Commerce correctly found insufficient record evidence to support Dingli's assertions that it had not purchased the disputed products and/or that the disputed products were incomparable to Dingli's purchases.

#### 1. Hollow Structural Shapes

In the underlying administrative review, Commerce selected fourteen HTS subheadings for the LTAR benchmark related to hollow structural shapes. Dingli asked Commerce below, and now asks the Court in this appeal, to remove eleven of those provisions that referenced either

"circular cross-section{s}" or cross-sections described as "not square or rectangular." *See* Dingli Br. at 13–14. Dingli asserts this revision was necessary because it had purchased only hollow structural shapes with square or rectangular cross-sections. *See id.* The three HTS provisions that would remain after Dingli's proposed deletions referenced cross-sections that were "square or rectangular cross-section{s}" or did not specify a shape. *See id.*

As the United States notes, Dingli did not demonstrate—or even argue—below that hollow structural shapes with circular cross-sections are incomparable to those with square or rectangular cross-sections in any salient way. *See* DOJ Br. at 22; *see also* Dingli Case Br. at 33–34. Instead, for the first time in its case brief, Dingli argued that its Initial Questionnaire Response had self-described only square or rectangular purchases and that Commerce should thus exclude all other shapes from its LTAR benchmark. *See* Dingli Case Br. at 33. In response, the Coalition argued: "Consistent with the Department's established practice, the agency should not exclude otherwise probative benchmark data unless they are incomparable to the HSS purchased by Dingli. Dingli fails to show that to be the case, and the record does not demonstrate that the HTS codes in question are not comparably priced to other types of HSS." Coalition Rebuttal Br. at 3. Commerce agreed. In the Final Results, Commerce made no changes to its benchmark selection, finding Dingli's incomparability arguments "unpersuasive." IDM at 28. As discussed above, Commerce disagreed with Dingli's articulation of the law as requiring benchmark sources that are identical, as opposed to comparable, to a respondent's purchases. *See id.* To that end, it found that Dingli did not "even articulate how HSS with a circular cross section is not comparably priced to HSS with square, rectangular, or other cross sections or otherwise not comparable to those products." *Id.* "Thus," the IDM concluded, "while Dingli has established the benchmark is not identical, Dingli has failed to demonstrate that the benchmark used is not comparable." *Id.*

Dingli's arguments on appeal do not show otherwise. In its opening brief, Dingli still does not cite record evidence either confirming its subjective description of its purchases as non-circular, or demonstrating that square or rectangular hollow structural shapes are incomparable to circular ones—because there is no such record evidence. *See generally* Dingli Br. at 13–20. Dingli continues to point to its Initial Questionnaire Response, in which it self-described its hollow structural shape purchases as square or rectangular. *See id.* at 14 (citing Dingli IQR (June 5, 2024), C.R. 8–45, P.R. 32–34 at Exhibit V.A.3.1b). But Dingli did not support those narrative descriptions with corroborating documentation or argue in any benchmark rebuttal that circular tubes are incomparable to its purchases and should be removed. In raising that argument for the first time in a case brief, Dingli assumed the risk that the record would lack evidence to substantiate it—which is precisely what Commerce found in the Final Results. *See* IDM at 28; *see also Shandong Jinxiang*, 429 F. Supp. 3d 1373 at 1379 ("Filing an administrative case brief affords interested parties an opportunity to present relevant arguments but is not an opportunity to correct factual information for Commerce's renewed consideration."); *Jinan Yipin*, 35 C.I.T. at 1292, 800 F. Supp. 2d at 1260 ("{T}he Chinese Producers were obligated to raise their questions in a timely fashion . . . , to afford Commerce and the Domestic Producers a proper opportunity to address them before the evidentiary record closed.").

Dingli's "mountain of cases," Dingli Br. at 17, underscores this point as well, *see, e.g.*, *Wood Mouldings* IDM at Cmt. 4 ("Mangrove did not provide the HS codes of the paint purchased to confirm the specific input, nor any purchase invoices that substantiate the specific type of paint provided. . . . Accordingly, the record does not support that the input benchmark should be limited{.}"); *cf. Aluminum Foil* IDM at Cmt. 16 ("{I}n order to verify Dingsheng's reported purchases of unalloyed aluminum ingots, we reviewed the purchase contracts."); *Multilayered*

*Wood Flooring* IDM at Cmt. 6 ("Baroque Timber argues that Commerce should exclude this HS code as it does not purchase plywood with tropical plies and provided sample documentation supporting its claim."). Commerce's rejection of Dingli's unsupported and undeveloped incomparability argument was thus reasonable and supported by substantial evidence on the record of this administrative review.

Unable to cite record evidence in support of incomparability, Dingli noted in its case brief, and asserts again on appeal, that Commerce excluded hollow structural shapes with circular cross-sections from its LTAR benchmark in the original investigation. *See* Dingli Case Br. at 33; Dingli Br. at 2, 15, 20. That is not supporting evidence. Administrative reviews are *sui generis*, and Dingli bore the "burden of again establishing, on the record of this review," that the disputed products were incomparable. *Hyundai Heavy Indus.*, 332 F. Supp. 3d at 1342 (emphasis added) (a respondent "may not . . . rely on Commerce's factual conclusions from prior reviews in the instant review because each review is separate and based on the record developed before the agency in the review"). Nor is a one-time decision, on a different record in which no other party submitted competing argument, an agency practice that requires either Commerce's adherence or explanation in prospective segments. *See Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*, 86 Fed. Reg. 57,809 (Dep't Commerce Oct. 19, 2021) (final affirm. countervailing duty deter.) and accompanying Issues and Decision Memorandum at 72 ("Original Investigation IDM") ("We received no other comments on this issue."); *cf. Baroque Timber*, 837 F. Supp. 3d at 1326 (finding plaintiff had not identified an "established agency practice" requiring a reasoned explanation for change, in pointing to a single prior proceeding) (citing *Shandong Huarong Machinery Co., LTD. v. United States*, 30 C.I.T.

1269, 435 F. Supp. 3d 1261 (2006) for the proposition that "two prior determinations are not enough to constitute an agency practice that is binding on Commerce").

In short, because Commerce's "decision is supported by a reasonable reading of record evidence," the Court should not "cast doubt on Commerce's reasonable selection of {} benchmark data, even though alternative data sets are available." *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1274 (Ct. Int'l Trade 2018); *accord Hindalco Indus. Ltd. v. United States*, 794 F. Supp. 3d 1367, 1383 (Ct. Int'l Trade 2025) ("{T}he question is not whether Commerce chose the best benchmark or whether a different combination of benchmark data would have been more reliable or more representative; rather, the court focuses on whether Commerce's benchmark determination finds support in the record, rests on sound reasoning, and is otherwise reasonable.").

**2. Hot-Rolled Steel Sheet and Plate**

For similar reasons, Commerce's benchmark determination as to hot-rolled steel sheet and plate should be upheld as well. For those inputs, as the United States notes, Commerce selected a world-market benchmark covering 27 HTS subheadings. *See* DOJ Br. at 24; IDM at 26–27. Dingli's benchmark submission had included a subset of those products, but Dingli again failed to submit a rebuttal to the Coalition's benchmark submission containing the HTS provisions that Commerce selected in the preliminary results. *See* Petitioner's Benchmark Submission (any rebuttal is due 10 days after the submission of affirmative benchmarks pursuant to 19 C.F.R. § 351.301(c)(3)(iv)). Moreover, Dingli's second affirmative benchmark submission and its first rebuttal benchmark submission included no argument or factual information regarding the superiority of its benchmark proposal or the supposed incomparability of any other benchmark source for hot-rolled steel sheet or plate. *See* Dingli Benchmark Submission; Dingli Rebuttal Benchmark Submission.

As noted above, while the factual record remained open, Commerce then specifically gave Dingli the opportunity to clarify its steel purchases after finding Dingli's original reporting to have been unclear and discrepant. *See* Dingli HRS Supplemental Questionnaire Response. Despite that chance, Dingli still failed to describe or document its steel purchases in sufficient detail to support the incomparability arguments it belatedly made. *See id.*; *see also* DOJ Br. at 24. Dingli's failure to make these factual assertions while the record was open is critical because it is only then that the Coalition could evaluate those claims and respond with clarifying or rebuttal information as needed.

Rather, in its case brief, Dingli argued for the first time that certain HTS subheadings "do not cover the hot-rolled plate Dingli reported and should be removed." Dingli Case Br. at 31. Specifically, Dingli argued that nineteen provisions should be removed because they were not expressly described as "hot-rolled," their thickness allegedly did not match Dingli's purchases, and/or they were coated, processed, or alloyed in allegedly different ways. *See id.* at 31–32 & Att. 2. In its submission, Dingli did not identify its own steel purchases' thicknesses, coatings, and so on, to distinguish the products that it asserted should be removed.[3] *See id.* Instead, the sum of Dingli's argument was to assert that, in the original investigation, the subheadings Commerce had selected for this input all referenced "hot-rolled" in their descriptions. *See id.* at 32. In rebuttal, and as demonstrated above, the Coalition noted that benchmark sources need not match a respondent's own purchase specifications identically. *See* Coalition Rebuttal Br. at 2. But, in any

[3] Indeed, Dingli's factual characterization of its hot-rolled steel purchases in its case brief, with respect to their thickness and other physical specifications, far exceed the information on the record. *See* Dingli HRS Supplemental Questionnaire Response at Exhibit SD-1. In this regard, these statements constitute untimely filed new factual information that was properly disregarded by Commerce in its final results. *See* Coalition Rebuttal Br. at 21–22.

event, "based on the minimal information provided by Dingli, the exact thicknesses and other specifications of Dingli's purchases are not clear, nor does Dingli make the necessary comparison to its own purchases." *Id.*

Again, Commerce agreed, finding Dingli's case brief arguments "unpersuasive." IDM at 26. *First*, Commerce reiterated that the law does not require benchmark products to be identical to a respondent's purchases. *See id.* at 26–27. *Second*, Commerce found that, in any event, "many of the details Dingli relies on to differentiate its purchases from HS subheadings used in the benchmark are not corroborated by the record": for example, "the exact thicknesses or exact kind of metal of Dingli's purchases are not clear in their response." *Id.* at 27. Finally, as to the suggestion that only products expressly described as "hot-rolled" may be considered, Commerce determined that, per "the excerpts of HS Chapter 72 provided in Dingli's own benchmark submission, any flat-rolled steel sheet or plate product is going to be hot-rolled, regardless of whether it subsequently undergoes cold-rolling or additional cladding, plating, or coating. As such, for an HS category to be representative of hot-rolled steel sheet or plate, it is not necessary for it specifically to list hot-rolled in the tariff line description." *Id.*

On appeal, Dingli does not—because it cannot—point to record evidence demonstrating the incomparability of Commerce's benchmark selections across the dimensions on which it relies. *See* Dingli Br. at 20–25. Instead, it again cites Commerce's benchmark selection from the original investigation. *See id.* at 20, 22, 25 ("In the original investigation, Commerce specifically limited the benchmark to 'hot-rolled steel straight products below 4.75 mm and all HTS codes for hot-rolled steel in coils.'"). For the reasons discussed above, one prior determination does not establish an agency practice. *See supra* at 18. And the comparison is especially inapt because (1) Dingli

did not raise the same incomparability arguments there,[4] but (2) another respondent did raise similar incomparability arguments, and Commerce rejected them for failure of adequate proof—just as it did here. *See* Original Investigation IDM at 66–68 ("{D}espite LGMG's claims that certain codes are irrelevant to its purchases, LGMG did not provide HTS data for its hot-rolled steel sheet and plate purchases, and, consequently, Commerce is unable to determine from record evidence whether its selection of HTS codes reflects only its purchases and is, thus, more accurate." (footnotes omitted)).

Moreover, as noted above, Commerce correctly found that it was appropriate in this instance to include HTS codes for cold-rolled steel as part of its hot-rolled steel benchmark. IDM at 27. In support, Commerce pointed to information from Dingli's own benchmark submission, which showed that "any flat-rolled steel sheet or plate product is going to be hot-rolled, regardless of whether it subsequently undergoes cold-rolling or additional cladding, plating, or coating." *Id.* As such, Commerce reasonably concluded that "for an HS category to be representative of hot-rolled steel sheet or plate, it is not necessary for it specifically to list hot-rolled in the tariff line description." *Id.* Put simply, as Commerce found, especially in a case like this where a respondent has not demonstrated the incomparability of cold-rolled HTS codes, it is entirely appropriate to use cold-rolled steel data as part of a broad hot-rolled steel benchmark.

---

[4] Commerce faced a different set of facts and arguments during the original investigation. There, respondents reported purchases of both hot-rolled sheet and hot-rolled plate, Original Investigation IDM at 62–66, and Dingli argued that Commerce should have combined the hot-rolled sheet and plate products into a single benchmark. *Id.* at 62, 64. The discussion Dingli cites from the original investigation thus did not involve a comparability determination along the lines asserted here, but rather primarily involved dividing data sources between the steel sheet and plate benchmarks, which also required distinguishing between straight and coiled sheet and plate products. *See id.* at 68. The original investigation is thus inapposite on this issue.

## V. <u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that the Court affirm the final determination in the underlying administrative review.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.
Theodore P. Brackemyre, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for the Coalition of American Manufacturers of Mobile Access Equipment*

Dated: November 19, 2026

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor's Response to Plaintiff's Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2024), is 7,105 words.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

*Coalition of American Manufacturers of Mobile Access Equipment*
(Representative Of)

November 19, 2026
(Date)